STATE

v.

Donald CROWHURST.

No. 82–134–C.A.

Supreme Court of Rhode Island.

Jan. 4, 1984.

Dennis J. Roberts, II, Atty. Gen., Michael R. Stone, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, Chief Appellate Div., for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Donald Crowhurst, was convicted of first-degree sexual assault by a Superior Court jury. He was sentenced to serve thirty-five years in prison and appeals his conviction. Hereinafter we shall refer to the defendant by his last name.

The complaining witness, whom we shall call Mary, worked at a restaurant in downtown Providence. On Friday, October 24, 1980, she and a co-worker, Charlene, made plans to go that evening to Lupo's, a nightclub also located downtown. After work Charlene ran into an old friend, Donald, and his companion, Crowhurst. At their urging, she agreed to change her evening's plans and convinced Mary to do the same.

With Crowhurst driving a red jeep, he, Donald, and Charlene picked Mary up at her home in Cranston at around 8 p.m. that evening for what was supposed to be an evening of "four-wheeling"[1] and frivolity. Mary, who was then eighteen years old, had never before met either of the two men. The four traveled hither and yon, with time out for stops at a liquor store and at the homes of two friends and for a detour to do some four-wheeling through the rugged terrain behind the premises of an East Providence truck dealer. Eventually, the group arrived at Chapter 11, a Central Falls nightclub. The women separated from the men, with both pairs consuming more drinks. Later, Mary wanted to go to Lupo's as originally planned, but Charlene refused to go. Crowhurst offered to take Mary there, so he, she, and Donald left Central Falls. After dropping Donald off near his house in Johnston, Crowhurst drove his passenger around the rural areas of northwestern Rhode Island. At some point they stopped in Johnston on Shun Pike and engaged in sexual intercourse. Mary claims the act was done forcibly and without her consent; Crowhurst claims it was consensual.

After the alleged assault, Crowhurst continued his drive around the area but, at Mary's request, stopped at a Howard Johnson's restaurant in Johnston. She went in, ostensibly to use the women's room, but promptly telephoned a friend. Then she sat down with two strangers, Robin and Rebec-

---

1. An activity that apparently involves driving a four-wheel-drive vehicle over uneven terrain.

ca Puopolo, and in an account interspersed with sobs and tears told them what had happened. At this juncture, the police were contacted, and ultimately Crowhurst was arrested.

In this appeal, Crowhurst raises a variety of issues that, when grouped, relate to (1) his effort to suppress statements he gave to the police and (2) his complaint that the trial justice erred in ruling as he did when presented with several evidentiary issues relating to restriction of cross-examination, his refusal at one point to pass the case, and his failure at another juncture to give cautionary instructions, as well as his denial of proposed requests to charge the jury.

In the initial stages of the investigation of Mary's complaint, she was not sure whether the alleged incident occurred in Joanston or in the Massachusetts town of Plainville. Eventually, all concerned agreed that the episode had in fact occurred in Johnston.

On the morning of Monday, October 27, 1980, in the town of Scituate, Rhode Island, Patrolman Paul Ciccarelli was at a fixed point of observation at the intersection of Routes 101 and 102 when he saw Crowhurst in his jeep traveling east on Route 101. Seated alongside Crowhurst was his wife. At that moment, Crowhurst was on his way from New Jersey to Johnston police headquarters where he had an appointment to meet a Detective Ferrante and discuss the alleged assault.

Patrolman Ciccarelli, who was totally unaware of Crowhurst's proposed destination, knew of the outstanding warrant issued for the arrest of Crowhurst by the Plainville police department. Consequently, he stopped the car and placed Crowhurst under arrest. Patrolman Ciccarelli knew Crowhurst from his "previous" contacts with the police. After the arrest, Crowhurst was placed in the patrolman's cruiser and given his *Miranda* rights. The officer read the rights from a card he carried. Included in the rights afforded on this occasion by the Scituate police were the four traditional *Miranda* warnings plus another admonition

in which Crowhurst was advised, "If you decide to answer questions now, without a lawyer present, you will still have the right to stop questioning at any time until you talk to a lawyer."

Among those awaiting Crowhurst's arrival at Johnston police headquarters was an investigator from the Plainville department who, upon learning that Crowhurst was under arrest at the Scituate headquarters, left Johnston, and arrived within minutes in Scituate. According to the investigator, when he first met Crowhurst, he showed him the warrant and let him read it. Crowhurst, after reading the warrant, reported that he couldn't understand what was going on. The investigator was then handed a "rights form" by the lieutenant in the Scituate police department, and he then proceeded to give Crowhurst the four traditional *Miranda* warnings. Obviously, the form with the four admonitions differed from the five-admonition card carried by Patrolman Ciccarelli. When Crowhurst was asked if he understood his rights, he answered in the affirmative, but when asked if he wanted to give a statement, he responded in the negative. He then told the investigator that he wanted to talk about the incident, but "I will not put anything in writing."

Crowhurst then proceeded to tell the officer about going out on a blind date that included his friend Donald. However, he knew neither Charlene nor Mary. He indicated that he had had a sexual encounter with Mary that took place in Johnston on Shun Pike. He painted Mary as the aggressor and himself as the reluctant participant who "couldn't resist any longer." He conceded that at one point he had struck Mary but claimed that this blow was given in retaliation because she had hit him first. Subsequently, Crowhurst waived any extradition proceedings and later that day voluntarily returned to Plainville and gave a second statement, which was almost a duplicate of the statement given in Scituate.

Crowhurst now claims that his motion to suppress should have been granted because

of the failure of the investigator to give him the so-called fifth *Miranda* warning, which would have informed him that he could have terminated the interrogation at any time he desired. The taint of this failure, he claims, permeates the Plainville interrogation even though the investigator insisted that he had given the fifth warning before the second interrogation took place.

█ Earlier, in *State v. Gianoulos,* R.I., 404 A.2d 81, 84 n. 2 (1979), we noted that the Supreme Judicial Court of Massachusetts took the position that while it might be a better practice to so do, there is no federal or state requirement directing the police to advise an accused of his right to terminate his questioning at any time. *Commonwealth v. Lewis,* 374 Mass. 203, 204–06, 371 N.E.2d 775, 776–77 (1978). A similar position has been taken by the Supreme Courts of Connecticut and Delaware. *State v. Cobbs,* 164 Conn. 402, 418–19, 324 A.2d 234, 244 (1973); *Gray v. State,* 441 A.2d 209, 217 (Del.1982). We share the sentiments expressed by our Massachusetts, Connecticut, and Delaware colleagues and accordingly hold that as a matter of policy, although the added precaution provided by the so-called fifth warning may be desirable, it is not constitutionally required. Unquestionably, the procedural dictates of *Miranda* were observed.

█ However, in order to have Crowhurst's admissions to the investigator deemed voluntary, the state must show by clear and convincing evidence that the admissions were the product of a free and rational choice and not the result of coercion of any type; and in reviewing such a determination, this court, in an independent examination of the record, must consider the totality of the circumstances present at the time the admissions were made and reverse such a determination only if the trial justice was clearly wrong. *State v. Verlaque,* R.I., 465 A.2d 207 (1983); *State v. Ortiz,* R.I., 448 A.2d 1241 (1982); *State v. Fuentes,* R.I., 433 A.2d 184 (1981); *State v. Benton,* R.I., 413 A.2d 104 (1980). Crowhurst argues that the trial justice impermis-

sibly reduced the amount of totality when he sustained the prosecutor's objections to questions posed to the investigator in regard to whether, before he spoke to Crowhurst about the events of the evening in question, he had inquired (1) if the arrestee wished to speak to his wife and (2) about the extent of his "educational background."

The state's response to the husband's professed desire to consult with the wife is quite simple. He never asked to see her. The investigator told the trial justice that Crowhurst desired neither the services of an attorney nor the assistance or presence of any other person.

As noted earlier, Mrs. Crowhurst accompanied her husband as he drove to Rhode Island from New Jersey. No one knows what the couple discussed before or during the return to Rhode Island, but it is reasonable to assume that the wife was aware of the course of action her husband was going to take once he encountered the police.

█ We see no necessity that the police be required to offer to make a suspect's wife available for consultation prior to the beginning of his interrogation. Not all spouses may display the understanding and support apparently exhibited by Mrs. Crowhurst. Even if Crowhurst had specifically requested to speak with his wife, such a request does not in and of itself invoke his right to be silent or his right to counsel. *State v. Franklin,* 103 R.I. 715, 722–23, 241 A.2d 219, 224–25 (1968).

█ In determining whether an individual understands his constitutional rights, we must consider several factors, including, of course, the level of a suspect's educational attainments. One may find out about the *Miranda* rights through attendance at a high school civics class, by watching one of the many detective shows appearing on television, or by personal experience through previous contacts either with the police or with the courts.

Just prior to the beginning of the suppression hearing, several documents were made part of the record. One was a fugi-

tive warrant lodged against Crowhurst by the State of New Jersey. This document indicates that on November 16, 1979, he was paroled after having served a portion of a five-year, seven-month sentence imposed after being convicted on a charge of having committed an assault with an intent to rape.

■ At the time Crowhurst met Mary, he was a man in his midtwenties. His prior involvement in New Jersey is telling evidence, in our opinion, that the constitutional warnings given him by the investigator were understood and that the waiver was knowingly and intelligently made. *State v. Cobbs,* 164 Conn. at 421–22, 324 A.2d at 245. From our independent examination of the record, we find there is ample evidence to support the denial of the motion to suppress.

The trial justice on two occasions rejected an attempt by Crowhurst's counsel to impeach the testimony of two of the prosecution witnesses by the use of allegedly inconsistent statements. The common rationale used by the trial justice in rejecting these attempts was that no mention of the respective statements was made during the direct examinations. Of course, this court on several occasions has observed that since the purpose of cross-examination is to impeach a witness's credibility, the general rule that confines the scope of cross-examination to facts brought out during direct examination is inapplicable when the questions are designed either to explain, contradict, or discredit any testimony given by the witness on direct examination or to test his accuracy, memory, veracity, or credibility. *State v. Benevides,* R.I., 420 A.2d 65, 69 (1980); *State v. Ragonesi,* 112 R.I. 340, 346, 309 A.2d 851, 854 (1973); *Atlantic Refining Co. v. Director of Public Works,* 102 R.I. 696, 713, 233 A.2d 423, 432 (1967).

At trial, during Mary's cross-examination, when asked if she and her companions had, while on their way to the Central Falls nightclub, pooled their money to make a purchase, she responded, "For what, may I ask?" At that point, Crowhurst's counsel

asked her if in light of her response she was going to deny that the quartet had stopped on the way to Central Falls to determine how much money she could contribute toward the purchase of some drugs. The trial justice, in sustaining the prosecutor's objection, described the inquiry as "clearly uncalled for." Later, when Crowhurst's counsel made an offer of proof, he claimed that his question was based upon a conversation that Charlene had had with an investigator from the Public Defender's staff in regard to "the group having stopped to make drug purchases." In rejecting the offer of proof, the trial justice relied on the absence of direct testimony about any such stops.

■ Obviously, a witness's testimony may be impeached by the admission of his or her prior statements that are inconsistent with the witness's in-court testimony— when a proper foundation has been made for the admission of the impeaching evidence. *State v. Cianci,* R.I., 430 A.2d 756 (1981). Once the proper foundation has been laid, the limitation on cross-examination to matters brought out on direct examination is no longer applicable, but here the defense, in seeking to impeach Mary with a statement supposedly made by Charlene, was homing in on the wrong target. Its impeachment effort should have been directed at Charlene only after her attention had been directed to the supposed statements and the circumstances under which they were made. *State v. Cianci,* R.I., 430 A.2d 756 (1981); *State v. Earley,* 118 R.I. 205, 373 A.2d 162 (1977). Thus, even though the trial justice's rationale was faulty, his rejection of the defense effort to impeach Mary's testimony was correct.

In her direct examination, Robin Puopolo told the jury that while she and her sister ministered to Mary's emotional needs, she observed on several occasions a jeep passing by the restaurant. During cross-examination she estimated that the period during which she watched the jeep passing by encompassed fifteen or twenty minutes. At this point, defense counsel once again referred to the investigator and asked Robin

if she remembered talking to him nine months earlier in January 1981. The prosecutor objected, and a side-bar conference ensued. Crowhurst's counsel explained that he was attempting to refresh Robin's memory by reminding her that she allegedly told the investigator that the period of the "pass by" was a half hour. The trial justice observed that this had "nothing to do with direct and * * * it doesn't belong in cross."

One's memory may be refreshed by an image seen or a statement read or heard. *McCormick's Handbook of the Law of Evidence*, § 9 at 14 (2d ed. Cleary 1972). In our opinion, Crowhurst's counsel at this juncture was entitled to attempt to refresh Robin's memory. If the cross-examination had been allowed to continue, Robin would have been asked if she had told the investigator that the period of the jeep's repeated passing by amounted to a half hour. Although the trial justice was mistaken in taking the position that he did, we see no prejudice to Crowhurst.

Crowhurst, however, believes that the trial justice's refusal to permit his trial counsel to "refresh" Robin's memory was highly prejudicial because it not only denied him an opportunity to impeach Robin's testimony but it also cast a shadow of doubt over testimony given by Donald's wife, who had previously testified that she had awakened during the night, between 4 and 4:30 a.m., and had come into the kitchen area to find Donald asleep on the kitchen table and Crowhurst deep in the arms of Morpheus while stretched out on a nearby couch.

Our examination of the record makes it abundantly clear that when Robin was speaking about the length of time she observed the jeep encircling the restaurant and that when Donald's wife [2] told the jury of finding her across-the-street neighbor

(Crowhurst) snoring away on the couch, neither witness was employing a precise time frame. Each witness claimed that the events to which she testified occurred within the period from four o'clock to four-thirty on the morning of Saturday, October 25, but qualified this testimony with such terms as "around," "somewhere in there," "about that time," and "in the neighborhood of." Even assuming that Robin, in speaking to the investigator, had given an estimate of thirty minutes, the ten-to-fifteen-minute differential between her testimony and that given by Donald's spouse is truly insignificant.

Nobody doubts that Crowhurst terminated his evening of four-wheeling and freeswinging [3] with a bit of repose at Donald's home. The testimony in question was peripheral to the real issue before the jury, and that was whether Crowhurst had participated in a rape or committed adultery. Crowhurst's trial counsel put the issue presently before us in its true focus when, in arguing to the jury, he said, "[T]he issue in this case is quite simple. The issue in this case is whether or not you can believe the testimony of [Mary]. If you cannot believe her testimony, you must return a verdict of not guilty." This obviously serves as further support to our belief that the trial justice's unwarranted rejection of the effort to refresh Robin's memory in no way worked to the prejudice of Crowhurst.

Crowhurst next alleges that the trial justice erred in admitting the testimony of the Puopolo sisters in which they repeated what Mary had told them in the restaurant shortly after the alleged assault. Their testimony was obviously admitted under the excited-utterance exception to the so-called hearsay rule.

---

2. Donald's wife also reported finding a blue jacket in her kitchen and lingerie in the living room. At trial Mary told the jury that the articles belonged to her.

3. Mary testified that when she rejected Crowhurst's advances, he told her she could "then just leave." When she had taken about five

steps, she was struck on the left side of the head. The force of the blow caused her to fall. Crowhurst then asked her if she wanted to get "hit around some more." Mary, who described herself to the jury as then being "scared to death," wisely responded in the negative.

The facts are not in dispute. Mary entered Howard Johnson's, went straight to the pay telephone, and called a friend. When the friend asked where she was calling from, Mary inquired of the Puopolos, who were sitting in a nearby booth. They told her, and when she had reported the location to the party on the other end of the line, she joined the two sisters. They both described Mary as upset, confused, disheveled, and crying. When questioned,[4] Mary told them of her ordeal.

This court has said that the trial justice, in considering the admission of alleged spontaneous utterances, must look at all the facts and circumstances before ruling whether or not the hearsay declarant was still laboring under the stress of the exciting event when he or she spoke. *State v. Creighton*, R.I., 462 A.2d 980 (1983). The essence of the excited-utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. Consequently, the evidence must be judged in terms of spontaneity and an analysis of whether the declaration is the result of thoughtful consideration or the product of an exciting event. The decision about whether the utterance was the result of thoughtful consideration or was the product of an exciting event is a matter addressed to the sound discretion of the trial justice and, once made, will not be overturned unless clearly wrong. *State v. Burgess*, R.I., 465 A.2d 204, 205 (1983); *In re Daniel*, R.I., 456 A.2d 258 (1983).

Sufficient evidence was presented here from which the trial justice could conclude that Mary was still laboring under the stress of the alleged assault. Although as much as three hours may have passed since the alleged assault, she was crying, bruised, and disheveled and in shock. We believe the trial justice was justified in admitting the Puopolo sisters' testimony about what Mary had told them.

During his testimony, Donald informed the jury that on the Saturday following his nocturnal four-wheeling adventure, he and his wife had attended a wedding. Prior to their departure, Donald had a brief conversation with Crowhurst. The prosecutor then asked Donald if Crowhurst was at the house when Donald and his wife returned from the wedding. Donald responded in the negative, and when Donald was then asked about the "next time" he had seen his friend and neighbor, he responded, "[T]he ACI."

Crowhurst's trial counsel went to the side bar and asked for a mistrial or, in the alternative, an admonition by the trial justice to the jurors that they were not to "draw any inferences whatsoever, and totally disregard" Donald's remark. The trial justice opted for the cautionary instruction and told the jury that Donald's remark "deserves no inference on your part at all. Can you all understand that?" Donald's direct examination then continued.

It is obvious that everyone was surprised by Donald's reference to the Adult Correctional Institutions, but as we have said, the handling of an extraordinary event that may arise during a trial is a matter left to the sound discretion of the trial justice, and the manner in which the episode is resolved will not be disturbed by us absent a finding of an abuse of discretion. We find no such abuse here. *State v. Byrnes*, R.I., 433 A.2d 658 (1981); *Webbier v. Thoroughbred Racing Protective Bureau, Inc.*, 105 R.I. 605, 254 A.2d 285 (1969).

At one point in his argument, the prosecutor specifically referred to certain roads in the Scituate-Johnston area and ar-

---

4. Rebecca Puopolo described Mary as she first observed her as disoriented, weeping, and "a mess," and in her effort to assist her she asked Mary "what was bothering her." Mary's response constitutes the excited utterance now under review. Even though the utterance is made in response to an inquiry, it may be admissible if the surrounding circumstances are such that they indicate that the exciting event still dominates the declarant's thought processes. *State v. St. Jean*, 469 A.2d 736 (R.I.1983); *State v. Creighton*, R.I., 462 A.2d 980, 982 (1983).

gued that Crowhurst never intended to take Mary to her home because the route he took after leaving Donald's house would have led him away from her Cranston home rather than toward it. At this point, Crowhurst's counsel lodged an objection, claiming that the prosecutor's geographical references were totally irrelevant because of a lack of any evidence about the routes of travel available to Crowhurst, and asked the trial justice to tell the jury it was to ignore the prosecutor's comment. The objection was overruled.

However, the record is replete with descriptions of pertinent geographical landmarks. When Donald was cross-examined by Crowhurst's counsel, inquiry was made about the location of Shun Pike and the fact that the Howard Johnson's that is situated in Johnston at the intersection of Routes 5 and 6 is east of Shun Pike. A suggestion was present in the record that when Crowhurst spoke with the police, he told them that when he left the Shun Pike area, he intended to convey Mary to her Cranston residence. Thus, it was fair for the jury to ponder, for what it was worth, why Crowhurst was traveling east on Route 5 rather than west toward Mary's home on the night and time in question.

 Crowhurst's final claim of error concerns the trial justice's refusal to charge the jurors that in determining Mary's credibility they could consider statements she made in the courtroom which were inconsistent with statements she previously gave to others. The defense placed special emphasis on statements made by Mary to an examining physician at Women and Infants Hospital on Saturday, October 25, 1980, at approximately 5:30 a.m. During cross-examination, Mary denied that she had engaged in oral sex with Crowhurst. The examining physician, however, testified that she told him that she had engaged in oral sex with Crowhurst. At trial, Mary testified that on the evening of October 24 and during the early hours of October 25, she had consumed one mixed drink and something less than six beers. Earlier, she

had told the physician that she had drunk approximately eight beers.

Recently, in *State v. Creighton*, R.I., 462 A.2d 980, 983 (1983), we once again stressed that a defendant is entitled to a charge that explains and informs the jury of the relevant propositions of law, but that when a request to charge is adequately covered by the instructions given to the jury, a refusal to comply with the defendant's request will not be considered as error.

Here, in his charge, the trial justice listed various factors that the jury could consider, such as the appearance of the witnesses, the manner in which they gave their testimony, their apparent frankness, the interest one may have had in the outcome of the particular case, the witness's intelligence or lack of intelligence, and the presence of testimony that would corroborate or in fact contradict the testimony of a particular witness. The trial justice told the jury that when assessing the credibility of witnesses:

"[U]se your common sense. Keep in mind when the testimony of one witness on a particular point is directly contradicted by the testimony of another witness on the same point, it does not necessarily follow that the evidence is balanced and at that point has not been proved. In that situation, it is your duty as jurors to decide and determine on the basis of all the testimony which of the two witnesses are more entitled to belief, and you will then afford that witness such credibility and such weight that, in your judgment, is warranted."

Here, it was obvious that the jurors were aware of the contradictions and gave them such weight as they wished, particularly since Crowhurst's trial counsel, as he neared the conclusion of his argument, (1) in referring to Mary's alcoholic consumption, described her testimony as a "lie" and reminded the jury that she never told the physician about the mixed drink (screwdriver) she had had at Chapter 11 and (2) pointed to the differences in the oral-sex testimony. It is obvious that the jury believed that Mary was in such a confused state of mind

when she arrived at the hospital that these inconsistencies were understandable for Mary's hope of an evening of frolic and fun had turned into the reality of a night of unspeakable terror.

The defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed.