**STATE**

v.

**William J. CARTER.**

No. 97–257–C.A.

Supreme Court of Rhode Island.

Jan. 28, 2000.

Virginia M. McGinn, Aaron L. Weisman, Providence, for Plaintiff.

John M. Verdecchia, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Safe haven? Preserver of life? Shelter from disaster? Not The Ark in this case. Instead, a botched break-in at a Newport bistro turned The Ark Restaurant (The Ark) [1] into a death vessel.

Convicted after a three-day trial of first-degree murder and breaking and entering a shop with intent to commit larceny, the defendant, William J. Carter (defendant or Carter), seeks an appellate Mount Ararat on which to rest his appeal.[2] He claims the trial justice committed multiple errors that warrant a new trial, including failing to suppress his confession to the police because it was involuntary, admitting into evidence photographs of the stabbing victim at The Ark that were prejudicial and inflammatory, and instructing the jury concerning defendant's "guilt or innocence" (thereby impermissibly shifting the government's burden of proof). For the reasons gathered below, we abate this flood of arguments and affirm that defendant's conviction stands on solid ground.

### Facts and Travel

In the early morning hours of November 23, 1991, around midnight, defendant suggested to his stepson, Stephen Burley (Burley), that they "do a hit"—by which expression Burley understood him to mean that they should "go out and rob someplace." [3] When Burley proved amenable,

---

1. The Ark amended its name on June 17, 1993.

2. "And the flood was forty days upon the earth; and the waters increased, and bare up the ark, and it was lift up above the earth. * * * And every living substance was destroyed which was upon the face of the ground, both man, and cattle, and the creeping things, and the fowl of the heaven; and they were destroyed from the earth: and Noah only remained alive, and they that were with him in the ark. * * * [A]nd after the end of the hundred and fifty days the waters were abated. And the ark rested in the seventh month, on the seventeenth day of the month, upon the mountains of Ararat." *Genesis* 7:17, 23; 8:3–4 (King James).

3. Ironically, some biblical commentators not only believe that thievery "represents an unpardonable low in human behavior because it shows man as a selfish being concerned with himself alone even at the expense of others," *see* Rabbi Meir Zlotowitz and Rabbi Nosson Scherman, 1(a) Bereishis VI, 15 at 214 (Mesorah Publications, 1988), but also that

defendant equipped himself with one or more duffel bags and drove both of them to Aquidneck Park. They left the car there because, as the defendant explained in his confession, he "didn't want to take a chance that [*sic*] the car being towed."[4] They then proceeded on foot to The Ark where defendant worked as a dishwasher. Burley and defendant climbed up onto a balcony attached to a building next to The Ark. From there, defendant scaled a ladder to a window on the third story of the restaurant and pushed it open. Clambering back down, he instructed his stepson to proceed up the ladder, enter through the window, and let him in through a side door on the next level down. Burley complied and, after they were inside, he and defendant—both wearing gloves—walked back upstairs, crossed to a main staircase, descended, and headed for the downstairs kitchen.

Unbeknownst to them, The Ark's custodian, Juan Riveira, was working late in the kitchen. Riveira, who cleaned The Ark four nights a week after closing, was a Salvadoran immigrant who had reason to regard The Ark as a sanctuary. According to his employer, a few weeks before the break-in, Riveira had been assaulted on his way to work and had fled to The Ark seeking a "safe haven." This particu-

lar night, however, The Ark failed to serve its biblical purpose of preserving life. Although "Noah remained alive, and they that were with him in the ark,"[5] Riveira would not survive his ordeal.

As Burley and defendant reached the bottom of the stairs, Riveira apparently heard their footsteps because he emerged from the kitchen to ask them what they were doing there. The defendant explained their presence by saying that they were looking for Jeff, The Ark's manager. Riveira responded that Jeff was not around at this time of the night and then, without further comment, he returned to the kitchen.

At that point, defendant told Burley that he was going to have to "do [Riveira] in" because he had seen them. The defendant grabbed a drinking glass from a nearby shelf and followed Riveira into the kitchen. Shortly thereafter, Burley, who had remained outside the kitchen, heard Riveira scream loudly in pain and say "no." Burley then fled the restaurant and hid in some bushes a couple of houses up the street. When defendant left The Ark a short time later, he was carrying two duffel bags, and his shirt and pants were covered with blood. On the way home, defendant calmly told Burley that he had

---

" [t]he Flood was precipitated by * * * robbery * * *. God tolerated Israel's most grievous sins as long as they were loyal to and considerate of one another * * *. To save earthly life by means of an ark and miraculous salvation from the ravages of the Flood would hardly have sufficed if the sin that finally caused the Flood had remained totally unredeemed. Therefore, the ark had to be more than a protection against the raging elements without; it had to enclose within a disparate collection of thousands of creatures led and cared for by Noah and his family, forcing them together, imposing upon them an awesome regimen of selflessness that allowed not a free moment for self-indulgence. Thereby, a human tradition was re-imposed. Cain asked 'Am I my brother's keeper?' Noah answered, 'Yes. I am the keeper of everyone, from human being to gnat, from docile lamb to voracious lion.' " *Id.* at 215.

4. The trial transcript reveals an apparent discrepancy with regard to where defendant parked the car that he and Burley used on the night in question. Burley testified that it was parked "in the parking lot next to the church," whereas defendant stated in his taped confession to the police that the parking place was "Aquidneck Island [*sic*] Park where the Newport library is." However, because the church in question is Saint Mary's Church on Memorial Boulevard in Newport, this variance is more apparent than real. Saint Mary's Church parking lot abuts Aquidneck Park.

5. *Genesis* 7:23 (King James). Interestingly, the Hebrew word for "Ark" is "teva," *see* Rabbi Meir Zlotowitz and Rabbi Nosson Scherman, 1(a) Bereishis VI, 15 at 230 (Mesorah Publications, 1988), referring not to a ship or boat of any kind, but to a box or chest that would be used to safeguard the contents thereof from harm.

killed Riveira. The defendant also related to Burley how Riveira had put up a fight and how he had stabbed Riveira several times. Back at home, defendant undressed in the living room, put his clothes in a plastic bag, and then put the bag out in the trash. At this point, Burley noticed that the two duffel bags were filled with steaks and liquor bottles.

A week later, defendant presented Mary Ann Franklin Crook, a friend defendant had known since junior high school, with some steaks and a bag of empty liquor bottles and instructed her to get rid of them. She complied, throwing away the empty bottles in the trash and consuming all of the steaks.

Detective Kevin Sullivan (Detective Sullivan or Sullivan) of the Newport Police Department responded to The Ark on the day of the murder and helped to conduct the investigation. His inquiries soon led him to Burley, whom he questioned on the afternoon of April 23, 1992, about the break-in and murder. Based on Burley's statements, the Newport Police Department obtained an arrest warrant for defendant. They executed it later that night, at approximately 11:43 p.m.

The defendant was taking a shower in an upstairs bathroom when police arrived at his home to arrest him. As Detective Sullivan, Detective Evan Hazel (Detective Hazel), and two uniformed police officers entered the bathroom, Sullivan identified himself, pulled aside the shower curtain, and informed defendant that the police had a warrant for his arrest. After defendant stepped out of the shower, the police afforded him an opportunity to dry off and to dress before they read him his *Miranda* rights.[6] The defendant said that he understood these rights. The police then handcuffed and transported defendant to the Newport police station, where Sullivan booked defendant and reread his rights to him on closed-circuit television. Once again, defendant told Detective Sullivan that he understood these rights. The police then allowed defendant to make a

phone call in the privacy of the cell area. The defendant did so and spoke on the telephone for fifteen to twenty minutes. After the phone call, the police asked defendant whether he wished to make another call or to speak with anyone else. He declined. The police then placed him in a cell for less than an hour.

At approximately 2:45 a.m. the police brought defendant upstairs to one of the interview rooms, where Detective Hazel joined them. The room was fifteen by nine feet, well carpeted, lit, and ventilated. Detective Sullivan asked defendant whether he would like something to eat or drink or whether he would like a cigarette. The defendant stated that he was not hungry, but would like a soda and cigarettes, which the officers then provided to him. Once again, Detectives Sullivan and Hazel advised defendant of his *Miranda* rights. This time the detectives also asked defendant to read the rights form himself, to initial each individual right, and to sign the waiver form. Both Detective Sullivan and Detective Hazel signed the form as witnesses.

The defendant initially denied any involvement in the homicide at The Ark. However, when the detectives told defendant that his stepson, Burley, had confessed, defendant "literally just let himself go, dropped his face into his hands and began crying, telling us that it was he himself who was involved in The Ark, that he did do it." At that point, the police instructed defendant that he could use the telephone or the restroom. After he regained his composure, they escorted defendant to the restroom.

Once back in the interview room, Detective Sullivan asked defendant whether he wanted an attorney. "He stated no. He stated that he wanted to cooperate or wanted to tell us what happened that night and give us a statement." Yet again, the police read him his rights and again he initialed and signed the waiver form. He also signed a statement that said "The police had made no threats or promises to

---

6. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

me." Detective Sullivan confirmed that neither he nor Detective Hazel made any threats or promises to defendant and that at no time during the interview did defendant request an attorney or ask to stop the interview. The police proceeded to record defendant's statement.

In his recorded statement defendant acknowledged that the police had read him his rights several different times during that night and early morning while he was in custody and that he understood those rights. He then began to relate the events of the night of November 23. He told the police that on that night he and his stepson, Burley, went to The Ark, where he directed his stepson to climb inside the restaurant and let him in through a side door. Upon encountering Riveira, defendant exchanged a couple of words with Burley. When Riveira went back to his business in the kitchen, defendant told Burley that he was going to "take this guy out * * * because he had seen us." The defendant then picked up a glass, hid it behind his back, went into the kitchen, and "smacked [Riveira] on the side of his face with the glass." He then managed to take control of the knife Riveira had in his hands and he used it to stab him repeatedly in the neck and side.

Doctor George Lauro (Dr. Lauro), a pathologist at the Rhode Island Medical Examiner's Office, performed the autopsy on Riveira's body. He testified that he found thirteen stab wounds and that, to a reasonable degree of medical certainty, the wounds would have caused pain to Riveira because it would have taken him a few minutes to lose consciousness, go into shock, and, finally, die. Doctor Lauro testified in conclusion that Riveira bled to death as a result of multiple stab wounds, and that it was a homicide.

## Analysis

### I

### The Denial of Defendant's Motion to Suppress His Confession

The defendant first argues that the trial justice erred in refusing to suppress the highly incriminating statement he gave to the Newport police in which he confessed to the murder and break-in at The Ark. The defendant argues his statement was coerced and that, therefore, its admission at trial violated his federal constitutional right to due process of law. However, because the totality of the circumstances pertaining to the taking of defendant's statement by the Newport police does not support this contention, we reject defendant's arguments on this issue.

Both the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary confession. *See State v. Humphrey,* 715 A.2d 1265, 1274 (R.I.1998). For a defendant's custodial confession to be admissible, the state must show that the suspect's waiver of his or her *Miranda* rights was "voluntary, knowing and intelligent." *State v. Marini,* 638 A.2d 507, 511 (R.I. 1994). The state must establish these factors by clear and convincing evidence during "a preliminary hearing [conducted] in the jury's absence." *State v. Bello,* 417 A.2d 902, 904 (R.I.1980).

The defendant acknowledges that no single factor is dispositive concerning the voluntariness of his statement to the Newport police. He asserts, however, that the aggregate effect of the circumstances surrounding his confession seriously undermined his ability to make a free and voluntary waiver of his rights. The defendant relies upon the fact that he was arrested late at night, was taken out of the shower, was kept awake until he gave his statement early the next morning, had only a limited education, and was interrogated several hours without food or rest. He also points to the fact that he initially denied his involvement in the murder for approximately an hour before the police turned on the tape recorder. The cumulative effect of his mistreatment, he argues, overcame his will and rendered his confession involuntary and thus inadmissible.

■ The facts and the applicable law, however, support the contrary conclusion drawn by the trial justice. In reviewing a trial justice's denial of a criminal defendant's motion to suppress a confession, we employ a two-step process. First, we accord deference to the trial court's factual findings concerning the historical events pertaining to the confession by using a "clearly erroneous" standard of review. *See State v. Page,* 709 A.2d 1042, 1044 (R.I.1998). Second, with respect to the ultimate conclusion of voluntariness, we review the trial justice's determination on a *de novo* basis because it involves a constitutional issue. *See Powers v. State,* 734 A.2d 508, 514 (R.I.1999) ("the ultimate determination [of] whether [defendant's] constitutional rights have been infringed must be reviewed *de novo* ") (citing *Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911, 919 (1996) (mandating "independent appellate review" of " 'whether the facts satisfy the [relevant] statutory [or constitutional] standard' ")).

■ A defendant's statement is voluntary if it was " 'the product of his free and rational choice' " rather than "the result of coercion that had overcome defendant's will at the time he confessed." *State v. Garcia,* 643 A.2d 180, 188 (R.I. 1994) (quoting *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981)). To decide whether a statement is " 'the product of his free and rational choice' " or the result of coercion, we consider "the totality of the circumstances surrounding the challenged statement." *Humphrey,* 715 A.2d at 1274; see also *Marini,* 638 A.2d at 512 (when considering voluntariness, the facts and circumstances surrounding the confession must be taken into account) and *Bello,* 417 A.2d at 904 (totality of relevant circumstances is considered when determining whether defendant's rights have been violated). An examination of totality of the circumstances involves consideration of the " 'background, experience, and conduct of the accused.' " *Garcia,* 643 A.2d at

189. These factors include "the level of a suspect's educational attainments." *State v. Crowhurst,* 470 A.2d 1138, 1142 (R.I. 1984). "A statement is involuntary if it is extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Humphrey,* 715 A.2d at 1274.

■ Here, a review of "the totality of the circumstances" surrounding defendant's confession supports the trial justice's finding that it was a voluntary act. Detective Sullivan ascertained that defendant had completed the eleventh grade at Rogers High School in Newport and had attended a portion of twelfth grade. He also noted that defendant could read when he asked him to recite the rights form out loud. *See Crowhurst,* 470 A.2d at 1142. The trial justice found that, in this case, defendant's late night arrest and early morning interrogation were not the product of coercive police tactics, but merely reflected the vicissitudes of the investigation and the fortuitous, late-in-the-day timing of the various events leading up to defendant's arrest. Burley's recorded statement first put the police on defendant's trail, but his statement to the police did not begin until approximately 5:10 p.m. After taking that statement the police still had to seek and obtain an arrest warrant. By the time they did so and then proceeded to defendant's home to arrest him it was 11:43 p.m. Because defendant happened to be showering when police arrived at his home to execute the warrant, the police had to wait for him to dry off and to dress before driving him to the police station. There, the police booked him and then allowed him to use the telephone for about twenty minutes. They then placed him in a cell for approximately an hour. Thereafter they asked defendant if he wanted food, drink, or cigarettes, which they then provided to him as requested. They then accompanied defendant to the restroom. Only three hours passed between defendant's arrest and his first in-

terview with the detectives at the station, and within fifty minutes after that he confessed.

During the three hours between the arrest and the interview, the record shows, the police provided defendant with his *Miranda* rights on three occasions, including an instance when he read them himself, initialed them, and signed each of the different waivers one at a time while he was being recorded on closed-circuit television—circumstances that strongly support the trial justice's finding that his confession was voluntary. *See Humphrey*, 715 A.2d at 1274 (holding that the defendant's waiver was voluntary in light of the fact that he "executed a written waiver upon which he initialed each individual prophylactic warning"); *see also State v. Bailey*, 677 A.2d 407, 409 (R.I.1996) (holding that statement was voluntary because the police "had given [the defendant] the *Miranda* rights form and that he had signed it"). In sum, defendant acknowledged his rights in writing and affirmatively waived his right to an attorney on more than one occasion. As Detective Sullivan testified "We asked him, I asked him specifically if he would like to use a telephone or have a telephone book available for him to call an attorney or call anybody else again, and he said no." Based upon this factual record we are unable to conclude that the trial justice erred in determining that there was no indication that the police officers coerced defendant into making an involuntary statement.

In his decision, the trial justice specifically accepted Detective Sullivan's testimony as truthful. He was also satisfied that defendant had been advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived those rights. The trial justice stated that "the actual taking of the statements as evidenced by the tape we heard that Mr. Carter knew the questions, understood them and there didn't seem to be any intimidation at all. In my hearing the tapes, he knew what he was being questioned on and responded to the questions." Our review of the factual record in this case reveals no error in the trial justice's findings on this issue.

The trial justice also determined that the police conducted the interview in about as comfortable a setting as would be possible in a police station. He found that it was conducted free of "threats, pressure or any undue influence" that would have rendered defendant's confession coerced. In fact, the evidence indicated that detectives affirmatively tried to create as relaxed an atmosphere as possible under the circumstances. As Detective Sullivan testified, "Due to the severity of the crime we were investigating, we slowed it up and a relaxed atmosphere was projected." The trial justice noted that, "[t]he whole atmosphere was not, you don't picture a police officer standing over someone and saying you confess otherwise you suffer the consequences." Although the date had changed between the time defendant was arrested and the time he confessed some three hours later, this was the result of the late hour of the arrest, not the length of the detention. The court also acknowledged that defendant had been offered food, drink, and cigarettes. Again, we conclude that the record amply supports the trial justice's finding that defendant's statement was not coerced, particularly in light of the fact that defendant offered no evidence whatsoever at the hearing that he had been coerced in any way. Such "statements by defendants are essential to society's compelling interest in finding, convicting and punishing those who violate the law." *See Garcia*, 643 A.2d at 190.

Finally the trial justice dismissed defendant's suggestion that he was the victim of a "good-cop/bad-cop" scenario that was enacted to trick or intimidate him into confessing. We also concur that the evidence utterly fails to support such a conclusion. As the trial justice stated: "I'm satisfied with the questions I heard, and the officer was doing his duty in asking the questions and attempting to elicit from Mr. Carter

whether he was acquainted with the homicide that had occurred and what his participation of [*sic*] it was." We are unable to ascertain any clear error in the trial justice's analysis, and our independent review of the voluntariness of defendant's confession reveals no constitutional improprieties. Thus, we reject defendant's argument on appeal that his confession was coerced.

## II

### Admission of the Crime Scene and Autopsy Photographs

■ The defendant next argues that the trial justice abused his discretion by admitting seven autopsy and crime-scene photographs at his trial. He argues that the photographs were so explicit, gruesome, cumulative, and inflammatory that they compromised his right to a fair trial. By admitting them into evidence, he contends, the trial justice committed reversible error. We disagree.

■ A trial justice has wide discretion to determine the materiality and relevance of crime-scene and murder-victim photographs. *State v. Rivera*, 640 A.2d 524, 526 (R.I.1994). The role of this Court on appeal is " 'to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice.' " *State v. Bettencourt*, 723 A.2d 1101, 1108 (R.I.1999). *See also* R.I. R. Evid. 403.[7] By their very nature, crime-scene photographs or pictures of murder victims may unsettle or even horrify the viewer, yet this Court has recognized that because it is the state's burden to prove each element of a crime beyond a reasonable doubt, such photographs are unquestionably relevant to its need to do

so. *State v. Ellis*, 619 A.2d 418, 424 (R.I. 1993). In *Ellis*, we stated:

"A murder committed in such fashion that the victim's head is blown apart by a shotgun blast is in itself a horrendous occurrence. The verbal depiction of evidence tends to be shocking to those in attendance at the trial. Every photograph and exhibit tends to be gruesome. Nevertheless, as we have stated in the past, the state bears the burden of proof on all issues." *Id.*

In *State v. Bertram*, 591 A.2d 14, 23 (R.I. 1991), we further noted:

"If we were to proscribe the introduction of photographs of murder victims whenever they tended to be prejudicial in any way whatsoever, few, if any, such photographs would be allowed into evidence, because, indeed, it taxes this court's imagination to conceive of an instance wherein a photographic depiction of the grim face of death would play pleasingly on the eye of a beholder."

This Court has consistently held that "when such evidence [that is, photographs] is probative, the trial court's admission of explicit photographs is not an abuse of discretion and will not be disturbed on appeal." *Hughes v. State*, 656 A.2d 971, 972 (R.I.1995). The test for determining the admissibility of photographs does not gauge their ghastliness, but instead asks whether they will "inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt." *Ellis*, 619 A.2d at 424 (quoting *State v. Fenner*, 503 A.2d 518, 526 (R.I.1986)). Indeed, only when such evidence is offered *solely* to inflame the passions of the jury should a photograph of a murder victim be excluded. *Rivera*, 640 A.2d at 526.

---

7. Rule 403 of the Rhode Island Rules of Evidence provides:

 "**[Exclusion] of relevant evidence on grounds of prejudice, confusion, or waste of time.**—Although relevant, evidence may

be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

In determining which photographs to admit in this case, the trial justice conducted a very careful and thoughtful review. Before trial, he examined all the photographs that the state wished to introduce as exhibits. He determined that certain photographs of the crime scene were duplicative and excluded them.[8] He also excluded a number of photographs of blood at the scene that he thought were not probative. He admitted numerous photographs of the stab wounds taken during the autopsy as evidence of the fact that the victim received thirteen stab wounds, a ruling that also was well within his discretion. *See Bertram,* 591 A.2d at 23 (holding that "photographs may be admitted for a number of · relevant purposes including * * * serving as proof of the corpus delecti [*sic*], displaying the extent of the victim's injuries, identifying the body and its condition, or bearing on the atrociousness of the crime"). With respect to the autopsy photographs, the trial justice specifically found that the admission of these photographs in evidence would better assist the jury in understanding the manner of the victim's death than the technical testimony of the medical examiner alone. With respect to the photographs that the trial justice allowed to be introduced, he stated that:

> "They will support a homicide or a death by unnatural means, and I think that's the function that I think the State has that obligation, but I don't think it puts any finger on anybody nor should it inflame these individuals, if they have not been inflamed just over the fact someone's been killed. I'm satisfied that it's necessary for the State to have

these photos to prove the homicide, and I balance that with whatever prejudice might exist. I'm satisfied that the prejudice that might exist is minimal compared to the obligation of the State to prove the case."

In light of the trial justice's careful examination of this evidence we cannot conclude that he exceeded the bounds of his discretion by admitting the challenged photographs. Reviewing the record in its entirety, we are of the opinion that these photographs did not so "inflame" the jury that it was unable to weigh the evidence and to reach a verdict in a rational and thoughtful manner. Moreover, the jury's request for additional instructions regarding the meaning of the term "reasonable doubt" tends to undercut defendant's assertions in this regard because it suggests that the jurors took their job seriously enough to make sure that their deliberations were in accordance with the court's instructions. Thus, we decline to reverse this ruling.

## III

## Jury Instructions on Defendant's Guilt or Innocence

■ The defendant next argues that the trial justice's reference to defendant's "guilt or innocence" during the jury instructions warrants reversal of his conviction because the use of these terms diluted the presumption of innocence and diminished the government's burden of proving the defendant guilty beyond a reasonable doubt.[9] The defendant fears that any instruction using the phrase "guilt or inno-

---

8. A trial justice's discretion in this regard is broad, and the question of whether photographic evidence is duplicative is a typical example of an issue that lies within that discretion. For example, in *State v. Sabetta,* 680 A.2d 927, 935 (R.I.1996), we held that it was within the trial justice's discretion to admit a videotape of the crime scene taken at the time of the murder, even though photographs of the same scene taken at the same time were also in evidence, because the videotape "exhibited details not apparent in the photo-

graphs which would assist the jury in understanding the crime scene."

9. The trial justice, for example, instructed the jury that "the guilt or innocence must be determined on the evidence or lack of evidence." However, he also told the jury: "This Defendant * * * is presumed in law to be innocent of the crime charged until you * * * are persuaded beyond a reasonable doubt of his guilt."

cence" tends to mislead jurors into thinking that to reach a not guilty verdict they must believe defendant to be innocent, whereas, of course, such a conclusion would require only that the jury did not believe defendant guilty beyond a reasonable doubt. The defendant, however, never challenged this instruction below and, thus, may not do so for the first time on appeal. *See State v. Donato*, 592 A.2d 140 (R.I.1991) (reiterating rule that issues not raised below are not preserved for appellate review).

 Moreover, even if defendant had preserved any objections he may have had for appellate review, the trial justice's "guilt or innocence" references during the jury instructions do not constitute grounds for reversal. We recently had the opportunity to restate the standard used for reviewing jury instructions in *State v. Brezinski*, 731 A.2d 711 (R.I.1999). In that case, we said that we would uphold jury instructions if they adequately cover the applicable law. "We shall not exaggerate out of context a single word or phrase or sentence in an instruction; rather, the challenged portion will be examined in the context of the entire instruction." *Id.* at 713. In a nutshell, "[a] trial justice's jury instructions will be upheld if 'they neither reduce nor shift the state's burden of proof.'" *Id.* (quoting *Marini*, 638 A.2d at 517).

The defendant relies upon the First Circuit Court of Appeal's concerns about the use of "guilt or innocence" phraseology in jury instructions, as expressed in *United States v. Mendoza–Acevedo*, 950 F.2d 1 (1st Cir.1991), and *United States v. Andujar*, 49 F.3d 16 (1st Cir.1995). It is impor-

tant to recognize, however, that the First Circuit in those cases held that the trial court's use of such language did not constitute plain error, and hence it affirmed the convictions in both instances. Although the First Circuit warned that using the term "guilt or innocence" when instructing the jury could *potentially* dilute the presumption of innocence and diminish the government's burden of proof, it concluded that in both these cases the danger of such dilution lessened significantly when it was considered in light of the jury instructions as a whole, because "[i]n reviewing the charge as a whole * * * any confusion engendered by the inappropriate references 'to guilt or innocence' were offset by the court's careful and clear discussion of the presumption of innocence and the government's burden of proof." *Mendoza–Acevedo*, 950 F.2d at 4. *See also Andujar*, 49 F.3d at 25 (stating that instructions about reasonable doubt were "adequate to ensure that the jury was informed of the government's burden of proof at trial and of the presumption of innocence cloaking criminal defendants").[10]

When he gave the jury instructions in this case, the trial justice repeatedly explained both the presumption of innocence and the burden of proof. For example, he stated:

"the proof of guilt beyond a reasonable doubt is the sole function of the State to prove.

* * *

"everyone charged with a crime, including this Defendant, whether in this Court or any other Court, is presumed in law to be innocent of the crime

10. Other courts have also upheld the use of this terminology in a criminal case. In *Stoker v. United States*, 587 F.2d 438, 440 (9th Cir. 1978), the Ninth Circuit Court of Appeals held that jury instructions that included a reference to defendant's "guilt or innocence" were proper. See also *State v. Hoffman*, 312 S.C. 386, 440 S.E.2d 869, 874 (1994) (instruction which contained reference to "guilt or innocence" contained the correct definition and adequately covered the law); *Flores v. State*,

920 S.W.2d 347, 357 (Tex.Ct.App.1996) (reference to "guilt or innocence" of defendant did not change state's burden of proof with respect to presumption of innocence in light of entire charge), and *Daniel v. State*, 582 N.E.2d 364, 373 (Ind.1991) (instruction that jury must determine defendant's "guilt or innocence" did not deny defendant presumption of innocence because the jury was also instructed regarding that presumption).

charged until you as members of the jury under the law and by the evidence are persuaded beyond a reasonable doubt of his guilt. This presumption of innocence you must accord to this Defendant.

\* \* \*

"The burden is on the State, on the Prosecutor at all times throughout the trial to prove the guilt beyond a reasonable doubt by credible evidence. That burden never shifts.

\* \* \*

"Now, this presumption of innocence that we talk about not only attaches to the whole offense but every element of the offense or offenses, and if you entertain a reasonable doubt as to any element of the offense you must find the Defendant not guilty as to that offense.

\* \* \*

"Remember, the Defendant is not required to prove his innocence, nor is he required to offer evidence of any kind nor to disprove. In explaining the burden of proof in a criminal case, as I previously indicated, is on the State and never shifts to the Defendant."

Specifically, the trial justice took considerable pains to emphasize that the jury's failure to find defendant guilty beyond a reasonable doubt *necessitated* a verdict of not guilty:

"But if you do not reach the unanimous conclusion that the Defendant has been proven guilty beyond a reasonable doubt, then the presumption of innocence ripens into a verdict of not guilty."

Moreover, the trial justice prepared written interrogatories for the jury to answer that indicated clearly that their verdict choice was to find the defendant "guilty" or "not guilty" of the charges. He also told them that their "verdict has to be one or the other, guilty or not guilty."

These excerpts from the trial record demonstrate that, when considered in their entirety, the jury instructions explained adequately to the jury the state's burden of proof and the presumption of the defendant's innocence. In light of the total charge, the trial justice's two references to the defendant's "guilt or innocence" would not have misled or confused the jury. Therefore, we reject the defendant's argument on this point.

### Conclusion

For the reasons detailed above, we affirm the Superior Court's judgment of conviction. As a result, the defendant's specification of alleged trial errors subsides with our denial of his appeal.