In re FRANCES G.

No. 2010–193–Appeal.

Supreme Court of Rhode Island.

Nov. 7, 2011.

Frank J. Milos, Jr., Esq., for City of Pawtucket.

C. Daniel Schrock, Esq., for Respondent.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

This case came before the Supreme Court on October 3, 2011, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### Facts and Travel

On September 20, 2009, twelve-year old Frances G. traveled with her mother, Frances Jones,[1] to the home of Jones' other daughter, Christy Thompson, to retrieve a curling iron. At her mother's direction, Frances knocked on the door of the Thompson apartment. Ms. Thompson sent her own daughter, Daiser, to answer

1. The last name of respondent's mother is unclear from the record. For the purposes of this opinion, we will refer to her as Frances Jones.

the door and to tell whoever was knocking that Thompson was sleeping. Undeterred, both Frances and her mother continued knocking on the door, ringing the doorbell, and using abusive and vulgar language. Ms. Thompson did not answer; instead she went to the third floor of her apartment and lay down. Two minutes later, she heard Daiser scream, "Willa is at your car with a brick." [2]

Ms. Thompson arose quickly and ran outside. She said that she saw her mother's car pulling away and she then observed that the front windshield of her car had been smashed. She also noticed there were dents and carvings on the vehicle. Thompson said that she had last seen her car the night before when she was taking out the trash, and at that time it was in "mint condition." Thompson reported what had occurred to the police.

Later that evening, Frances and her father were contacted by the Lincoln [3] Police Department and informed that the Pawtucket police wished to see the young girl. When Frances and her father voluntarily arrived at the Pawtucket Police station, they were met by Officer John Donley. Officer Donley testified that he had just begun his tour of duty and that he became involved in the incident because he was asked to follow-up on an investigation that another officer had begun earlier in the day. Officer Donley said that although he was aware that Frances was suspected of being involved in the incident, he nonetheless "asked for a general breakdown of what transpired" before he gave her any "*Miranda*" [4] warnings.

After speaking briefly with the young girl, Officer Donley informed Frances of her *Miranda* rights in writing, and he reviewed the printed form on which the rights were set forth with both Frances and her father line by line, in an effort to make sure that each of them understood the form. Frances subsequently gave Donley both an oral and a written statement about what had occurred at the Thompson home earlier that day. Frances was never alone with the officer; her father accompanied her at all times. Officer Donley described the young girl as "cooperative," and stated that he was "absolutely" sure that she had understood her rights. He testified that no promises were made to Frances before she signed the document, that he never threatened her in any way, and that her father did not tell her that she was required to sign it.

In her statement, Frances revealed to Officer Donley that her mother had directed her to smash the window of Ms. Thompson's vehicle and that she had done that by throwing a rock or a brick against the windshield. Frances also admitted that she had carved something into the side of the vehicle, and she acknowledged that she was completely responsible for what had happened. After she gave her statement, Frances was charged with being a wayward juvenile because she had maliciously damaged the property of another.

On February 2, 2010, after a trial before a justice of the Family Court, Frances was adjudicated to be wayward. The trial justice ordered that Frances be placed on probation for one year and that she per-

**2.** Both Ms. Thompson and Frances' mother, Ms. Jones, testified that "Willa" is Frances' nickname.

**3.** It is not completely clear whether it was the Lincoln or Cumberland police contacted Frances' father, but it is undisputed that nei-

ther Officer Donley nor any other member of the Pawtucket Police Department contacted him.

**4.** *See Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

form thirty hours of community service. The respondent timely appealed the Family Court adjudication to this Court. On appeal, respondent raises two issues. First, she contends that the trial justice erred when she allowed Thompson to testify about what her daughter told her she saw Frances do to the car. Second, she argues that the statement that she gave to Officer Donley should not have been admitted into evidence because the statement was obtained in violation of her Fifth Amendment rights.

## Analysis

### I

### Excited Utterance

■ The first issue raised by respondent on appeal is that the trial justice committed reversible error when she admitted into evidence Thompson's testimony about the statement made by her daughter. The respondent maintains that the testimony was hearsay[5] and that the city failed to lay an adequate foundation to qualify Daiser's statement as an "excited utterance" under Rule 803(2) of the Rhode Island Rules of Evidence. Rule 803(2) describes an "excited utterance" as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

■ "This Court consistently has held that determining the admissibility of evidence is squarely within the purview of the trial justice." *State v. Johnson*, 13 A.3d

1064, 1065–66 (R.I.2011); *see also State v. McManus*, 990 A.2d 1229, 1234 (R.I.2010); *State v. Reyes*, 984 A.2d 606, 614–15 (R.I. 2009). We will not disturb a trial justice's evidentiary ruling absent a determination that the ruling constituted a clear abuse of her discretion. *Johnson*, 13 A.3d at 1066; *McManus*, 990 A.2d at 1234; *Reyes*, 984 A.2d at 614–15.

Here, the trial justice found that Thompson was credible when she described her daughter as "normal" prior to the incident and when she said that her daughter began screaming in what the witness described as a "loud and frantic" voice as she described what she was observing. The trial justice held that the testimony provided an adequate foundation to admit the statement under the hearsay exception of Rule 803(2).[6] In our opinion, the trial justice was not clearly wrong when she allowed Thompson to testify to what her daughter said to her, because the circumstances satisfied the requirements of Rule 803(2).

### II

### Statements Made Prior to and After *Miranda* Warnings

■ The second argument raised by respondent is that the statements that she made to Officer Donley, both before and after she was informed of her *Miranda* rights, should have been suppressed. Primarily, respondent argues that she made admissions against her interest before she was advised of her right to remain silent.

5. Rule 801(c) of the Rhode Island Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted."

6. It is noteworthy that Ms. Thompson's daughter described and explained what was happening while she was looking out the win-

dow at Frances holding the brick. This statement could also have been admissible under Rule 803(1) of the Rhode Island Rules of Evidence as a "present sense impression," defined as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition * * *."

In making this argument, respondent relies on the reasoning of *In re Harold S.*, 731 A.2d 265 (R.I.1999) and asserts that she was in police custody because she was taken to the police station by her father and that the interrogation deprived her of her freedom of action to the extent that rendered the interrogation custodial.

■ "In reviewing the denial to suppress a confession, we first 'accord deference to the trial court's factual findings concerning the historical events pertaining to the confession by using a "clearly erroneous" standard of review.'" *State v. Ramsey*, 844 A.2d 715, 719–20 (R.I.2004) (quoting *State v. Carter*, 744 A.2d 839, 845 (R.I.2000)). "[A] finding is clearly erroneous 'when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *State v. Gonzalez*, 986 A.2d 235, 242 (R.I.2010) (quoting *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974)). Next, "[w]ith respect to the voluntariness of a statement, we then 'review the trial justice's determination on a *de novo* basis because it involves a constitutional issue.'" *Ramsey*, 844 A.2d at 720 (quoting *Carter*, 744 A.2d at 845).

In *Harold S.*, 731 A.2d at 266, a school principal called the father of a student into his office after hearing that the student had been involved in an altercation the previous day. After his father arrived at the school, the student was also summoned to the principal's office. *Id.* The student incriminated himself to the principal, who then reported the boy's admissions to the police. *Id.* In our view, however, respondent's reliance on *Harold S.* is misplaced. In that case, we held that the interrogation of the youth was not custodial in nature. *Id.* at 268. We noted that no police were present, that the principal was not acting as an agent for the police, and that the boy's father was present at all relevant times. *Id.* at 267–68.

■ This Court has held that *Miranda* "does not come into play unless it is triggered by two factors: (1) custody, and (2) interrogation." *State v. Grayhurst*, 852 A.2d 491, 513 (R.I.2004) (quoting *State v. Edwards*, 810 A.2d 226, 239 (R.I.2002)). "[C]ustody as contemplated by *Miranda* does not exist merely because the interrogation occurs at a police station or because the interrogated person is suspected of a crime or is the focus of a police interrogation." *Edwards*, 810 A.2d at 240 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)).

■ "[T]he decisive test for determining whether a person is in custody for purposes of receiving *Miranda* warnings is whether the person is formally arrested or whether the person's freedom of movement is restricted to the degree associated with formal arrest." *Edwards*, 810 A.2d at 240 (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). In the case of a juvenile, the Court should include a child's age as part of the custody analysis "[s]o long as the child's age was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer * * *." *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, 2399, 2404, 180 L.Ed.2d 310 (2011).

Here, the record is devoid of any evidence that respondent was ever in custody until after she was given her *Miranda* rights. Officer Donley testified that another police department contacted Frances, that she voluntarily came into the police station, and that she was accompanied by her father at all times. Officer Donley said that he asked for a "general breakdown" of what had happened that day because he was unfamiliar with the

incident and he wanted to understand why respondent and her father were there.

Frances was not arrested or handcuffed when she entered the station. No evidence was presented that suggested her freedom of movement was restricted in any way until after she was properly given her *Miranda* warnings. There is no question that Frances' young age would have been apparent to Officer Donley when he first met her. However, we are of the opinion that under an objective inquiry, Frances' age is not a "determinative * * * factor" in this specific custody analysis. *J.D.B.*, 131 S.Ct. at 2406.

There is no doubt that Officer Donley inquired of Frances. Nonetheless, no evidence was presented that Frances was ever coerced, threatened, or pressured into answering his question about why she was at the station. Thus, the statement given by Frances in response to Officer Donley's asking for a "brief summation" was properly admitted into evidence by the trial justice because Frances was not in custody at that time. Therefore, the only remaining issue is whether respondent thereafter validly waived her *Miranda* rights.

 As we review this record, we are very much aware that respondent is of tender years. For that reason "[i]t is well-settled that 'the validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding that waiver.'" *In re Joseph B.*, 822 A.2d 172, 174 (R.I.2003) (quoting *State v. Kryla*, 742 A.2d 1178, 1184 (R.I.1999)). There, this Court observed:

> "the totality-of-the-circumstances test requires consideration of all of the circumstances surrounding the interrogation of a juvenile suspect, including the juvenile's age, experience, education, and intelligence, his or her capacity to understand the Miranda warnings and the consequences of waiver, and the

presence of a parent, a guardian, or an interested adult." *Id.* (quoting *State v. Campbell* 691 A.2d 564, 567 (R.I.1997)).

When she denied respondent's motion to suppress her statement, the trial justice found that respondent "gave a fair, and accurate, and voluntary and complete statement to the police in the presence of her father, after she had been given her *Miranda* rights." She also found respondent did not incriminate herself until after she had been given her *Miranda* rights and indicated that she "totally understood" them.

After our *de novo* review of the totality of the circumstances surrounding the respondent's waiver of her rights, we conclude that the respondent knowingly and voluntarily waived her *Miranda* rights. At the time of the statement, Frances was only twelve years old, but she was at all times accompanied by her father. Officer Donley testified that he read and reviewed each line of the rights form with the respondent and her father and that he had both of them initial each line and then sign the form. He said that after reading each line, he asked if they each understood what he was reading to them and that after each line, both Frances and her father indicated that they understood. The trial justice found it was only after the respondent was informed of her *Miranda* rights that she gave a full and detailed verbal statement, followed by a similar written statement about what had taken place at the Thompson home.

## Conclusion

For the reasons set forth in this opinion, the adjudication of the Family Court is affirmed. The record may be remanded to the Family Court.