254 A.2d 285.

JAMES JOSEPH WEBBIER *vs.* THOROUGHBRED RACING
PROTECTIVE BUREAU, INC.
JAMES JOSEPH WEBBIER *vs.* BURRILLVILLE RACING
ASSOCIATION.

MAY 26, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

606

**KELLEHER, J.** These are two actions of trespass wherein the plaintiff seeks damages for false arrest and assault and battery. These actions were instituted prior to the effective date of the superior court's new rules of civil procedure. Thereafter they were consolidated and tried to a jury in the superior court which returned a verdict of $4,000 in each case. The trial justice denied the defendants' motions for a new trial, but granted such a motion to the plaintiff on the issue of compensatory damages[1] unless the defend-

---

[1] In each case, plaintiff sought compensatory and punitive damages. The jury awarded compensatory damages only. The trial justice in granting plaintiff a new trial specifically limited it to the issue of compensatory damages.

ants consented to an additur of $3,500 to each verdict. The case is before us on the defendants' appeals.

One defendant, Burrillville Racing Association, operates the Lincoln Downs Race Track. The other defendant, Thoroughbred Racing Protective Bureau, Inc., is a New York corporation specializing in the maintenance and supervision of police and security activities of personnel employed by various thoroughbred racetracks in this country. Hereafter reference will be made to the racetrack and the bureau respectively.

James Webbier, the plaintiff, is a combat veteran of World War II. As an army infantryman, he participated in military operations incidental to the seizure of the Normandy beachhead. In July 1944 he was under artillery attack when a shell exploded nearby wounding him in the chest. He was evacuated to London where he was treated for physical injuries and combat fatigue. Five months later plaintiff was returned to the United States for further hospitalization followed by his severance from the military for medical reasons. Since that time, plaintiff has required periodic treatment by the veterans administration for psychoneurosis. This nervous disorder is causally related to his combat ordeal. He receives a government pension for his service-connected disability which at the time of the incidents described hereafter was a 70 per cent disability pension but had increased to 100 per cent at the time of the trial. A psychiatrist who testified for plaintiff reported that his patient, a man of more than 40 years, had the mental age of a 10-year old.

The plaintiff likes to watch horses. On September 6, 1962, he went to Lincoln Downs and purchased a ticket for the clubhouse section. He sat in the box-seat area with three other persons. One of these was a man described only as Joe. Prior to the third race, plaintiff and his friend left their seats and walked to a vending stand where hot dogs

and soda were sold. There plaintiff "slipped" Joe a $5 bill, whereupon two men employed as racetrack detectives appeared and ordered both men to accompany them to the offices of the bureau.

The detectives were Raymond D. Tempest and Raymond J. Shannon. Both are part-time employees at the racetrack. Each man holds high rank in the police departments of different cities in this state. Tempest is the chief inspector of the Woonsocket police department. He is over six feet tall and weighs in excess of 265 pounds. Shannon is a lieutenant in the detective division of the Pawtucket police department. Although these men are paid on a daily basis by the track, they work under the direction and control of the bureau.

The testimony as to occurrences after the initial confrontation at the hot-dog stand is in conflict. Webbier testified that when Tempest ordered him and his companion to go to the bureau's offices that he inquired as to the reason. To this Tempest replied "Just come with me." They were escorted to the upper grandstand where the bureau maintains its offices comprised of an outer and inner room.

The plaintiff described the ensuing events as follows:

Upon his arrival at the bureau's offices, he was kept in the outer office while Joe was first interrogated in the inner room by the bureau's agent-in-charge, Clifford A. Wickman. While he waited in the outer office, plaintiff was accompanied by Tempest. The plaintiff asked to leave but Tempest would not permit him to do so. When Joe's questioning was concluded, he was escorted out past Webbier and allowed to return to his seat in the clubhouse.

The plaintiff was then led into the inner office where Wickman undertook his interrogation. Present were Tempest, Shannon and a third detective. Wickman inquired as to plaintiff's source of income and was told of Webbier's

pension. When Wickman sought the amount of the pension, plaintiff stated that he could not divulge this information. Wickman then ordered plaintiff to empty his pockets. The plaintiff refused asserting that their contents were none of their business. To this the agent-in-charge said "You're one of the wise-guys, I'll take care of you." Detective Tempest then audibly concurred with Wickman's remark indicating that he also would take care of Webbier. At this time Wickman said to Tempest "Take him and throw him out of the place."

Tempest seized plaintiff by the arm and pulled him from the office to a narrow stairway leading to a lower level. As plaintiff was descending the stairs, Tempest was behind him pushing him in the back. The plaintiff fell down the stairs. Recovering himself, he became unnerved and began to vomit. People gathered curious as to the cause of the commotion. Tempest then escorted plaintiff to the grandstand exit refusing to allow him to leave by the clubhouse gate which was closer to his automobile.

The plaintiff drove to the Lincoln barracks of the state police where he lodged a complaint concerning his treatment. This was on Thursday. On the following Monday, Mr. Webbier was admitted to the hospital for treatment of nervous upset.

Wickman and the two detectives testified to a contrary version of the afternoon's activities. The plaintiff, they said, was not mistreated nor was he confined in any manner. They denied that plaintiff had been touched physically saying that he did not have to come to the bureau's offices and once there, he could have left of his own volition. They conceded that they did not inform plaintiff that he could stay or go as he pleased. The defense witnesses agreed that they intended to permit Webbier to rejoin his friend in the clubhouse but that his boisterousness necessitated his ejection.

In their separate appeals, each defendant has alleged that the trial justice erred in numerous rulings he made during and after the trial. Many of their claims lack any merit whatever and they shall not be discussed herein. We have, however, for ease of understanding grouped defendants' claims which we deem worthy of consideration in this appeal. In many instances, defendants' contentions overlap each other.

## I

### The Liability of the Racetrack

In his charge to the jury, the trial justice ruled that Wickman, Tempest and Shannon were agents of the bureau. None of the parties before us disputes this conclusion. The racetrack, however, disclaims liability for the detectives' actions arguing that as related to it, the detectives were only agents of an independent contractor. We cannot agree.

It has long been the general rule in this state that vicarious liability does not flow from the act of an independent contractor. This rule is not without exception. See *Blount* v. *Fong*, 48 R. I. 453, 138 A. 52. There we noted that where a duty to the public is imposed by ordinance, the contractee cannot escape liability by the simple expedient of delegating the work to an independent contractor. We approved the rule that the employer remains liable despite his delegation of a responsibility imposed by law.

The record before us shows that the racetrack operates by a license granted to it by the state commission on horse racing and athletics. G. L. 1956, §41-3-9, authorizes the race commission to promulgate rules for the operation of the track and stables. Rule 593 is one such promulgation:

> "593. It is also the duty of the Track Superintendent to preserve order, enforce decorum, and prevent petty games of chance on the grounds of the Association at such times as a Meeting is not in progress. When a Meeting is in progress, those duties *shall fall upon the Association Police Force.*" (italics ours)

In 1960 the general assembly enacted chap. 148, §1, now cited as G. L. 1956, §41-3-17, as amended, entitled Ejection of undesirable persons—Rights of licensee:

> "Any licensee hereunder shall have the right to refuse admission to and to eject from the enclosure of any race track where a race meeting licensed under the provisions of this chapter, is being held, any person or persons whose presence within said enclosure is, in the sole judgment of said licensee, its agents or servants, undesirable, and whose presence is inconsistent with the orderly and proper conduct of such race meeting."

It is readily apparent to us from a reading of the racing commission's rules and the statute vesting the racetrack with broad powers of ejection that the protection of the race-going public from the presence of bookmakers, touts, pickpockets and other undesirables is a duty which is imposed by law upon the racetrack. While nothing prevents a licensee from permitting a third party to carry out this activity, defendant racetrack cannot expect to avoid liability by so doing.

We have examined many cases involving facts similar to those we find before us, especially those cases found in Annot., 92 A.L.R.2d 15, at 61. We believe that our holding that the racetrack's responsibility for the protection of the public and the preservation of order upon its premises is nondelegable is consistent with the better rule in these cases. See *Szymanski* v. *Great A & P Tea Co.*, 79 Ohio App. 407, 35 Ohio Op. 177, 74 N.E.2d 205; *Adams* v. *F. W. Woolworth Co.*, 144 Misc. 27, (N. Y.) 257 N.Y.S. 776. We feel that a holding to the contrary would immunize the racetrack from responsibility imposed by law thereby permitting it to subject its patrons to the hazards of an irresponsible detective agency while escaping all danger of legal ramifications adverse to itself.

## II

### The Court's Failure to Direct a Verdict for Defendants

In reviewing defendants' contentions as to the denial by the trial court of their motions for a directed verdict, we have viewed the evidence produced by plaintiff in a light most favorable to his cause. We find no merit in defendants' arguments that the trial justice committed error in permitting the jury to consider plaintiff's counts for false imprisonment, assault and battery.

In *Barth* v. *Flad*, 99 R. I. 446, 208 A.2d 533, this court pointed out that the essence of an action for false imprisonment is the restraint of another without legal justification. The tort involves an imposition of unlawful restraint upon another's freedom of movement. This restraint need only continue for no more than a brief time. See Restatement (Second) of Torts, §35. If a person is unlawfully detained by another and is fearful that physical force will be used unless he submits to the detention, his submission thereto will not bar his cause of action. See *Zayre, Inc.* v. *Gowdy*, 207 Va. 47, 147 S. E.2d 710.

While the racetrack admits that a false imprisonment action goes to the question of an illegal restraint, it takes solace in Webbier's statement that he had no fear of Tempest as he was being brought from the vending stand to the bureau's office. It claims that he consented to be interviewed by the bureau's agent. The defendants, however, overlook the events that took place after Webbier had reached the office. The plaintiff testified that Tempest remained in his company for the duration of his detention in the outer office. When he asked the detective if he could leave, he was told that he could not. As of that moment, plaintiff's freedom of locomotion was clearly infringed upon. It was not necessary for plaintiff, a man of slight proportions, to brave the consequence of resistance in the face of his physical disadvantage. A man in such a position need

not risk bodily injury as a means of perfecting his right of recovery. The plaintiff acted with prudence in declining such a course of action.

Considering the evidence as it bears upon plaintiff's claim for assault, we do not dispute the racetrack's recitation of the familiar principle that words alone do not give rise to a cause of action. The defendants argue that the facts put forward by plaintiff show nothing more than a situation in which harsh words were directed at him by Wickman and Tempest. For this reason, they allege that the trial court erred in failing to direct a verdict upon plaintiff's count for assault. We feel that defendants' contention involves a considerable understatement.

Most simply stated, an assault is a physical act of a threatening nature which puts an individual in fear of immediate bodily harm. See Restatement (Second) of Torts, §21. It is the complainant's apprehension of injury which renders the defendant's act compensable. See *Henry v. Cherry & Webb,* 30 R. I. 13, 73 A. 97. Words alone are never a sufficient basis for a finding for assault. See *Kaufman v. Kansas Power & Light Co.,* 144 Kan. 283, 58 P.2d 1055; Restatement (Second) of Torts, §31. However, words can give character to subsequent physical acts. See *Hulse v. Tollman,* 49 Ill.App. 490; *Keep v. Quallman,* 68 Wis. 451, 32 N.W. 233.

In the present case, Mr. Webbier's testimony reveals that his refusal to manifest the contents of his pockets was met with words of ominous connotation from both Wickman and Tempest. Both individuals said they would "Take care" of plaintiff. Wickman then told Tempest to take Webbier and "Throw him out of the place." Tempest took plaintiff by the arm. While no statement is found on the record confirming the fact that Webbier was put in fear as Tempest approached him to carry out the command, we feel that the testimony regarding this occurrence must

be read in its entirety. When we do this, we are convinced that there was sufficient evidence to go to the jury on the count for assault.

Immediately after plaintiff indicated that Tempest had taken him by the arm, the following testimony was elicited from him by his attorney:

"Q What did Mr. Tempest do next?
"A He said, 'Come on, let's get out of here.' And he took me by the arm, and dragged me out.
"Q What did he do next?
"A As I was walking down the stairs, *I was scared* of him because I started to get nervous." (italics ours)

We feel that plaintiff's statement that he was *scared* as he was being dragged out must be read in the light of his previous testimony as to the detective's remarks and his perception of Tempest approaching him and seizing him by the arm. We feel that a jury considering this testimony as a whole could properly infer that plaintiff was also put in fear as Tempest moved toward him. In short, we have no difficulty in agreeing with the trial court that plaintiff's assault count was a matter for the jury.

In pressing its motion for a directed verdict, the bureau classifies plaintiff's testimony as being inherently improbable and incapable of belief citing the case of *Gaudette* v. *Carter*, 100 R. I. 259, 262, 214 A.2d 197, 199. However, we have carefully studied the record in this case and we cannot describe plaintiff's testimony as inherently improbable or unworthy of belief. Much of his testimony finds corroboration in the records of the state police and the veterans administration. While there is a conflict in the evidence as to the occurrences at Lincoln Downs on the day in question, this conflict exists in credible evidence adduced from both sides. The jury selected the evidence which it felt to be the most credible and we will not now disturb their finding.

## III

### The Defendants' Motion to Pass the Cases

These suits were marked by two unusual occurrences involving the jury. During one of the trial recesses, counsel for one of defendants observed the foreman of the jury talking to Lieutenant Shannon and brought this fact to the trial justice's attention. The foreman was excused from further service on the panel. Later that same day at the noon hour recess, defense counsel saw the now ex-foreman talking with two or three members of the jury. Counsel then notified the trial judge of this fact and moved that the cases be passed. The judge summoned the former member of the jury to his chambers and talked to him in the absence of the litigants' attorneys. The court was then reconvened and the former foreman took the witness stand and testified that while he did indeed talk to three of his former colleagues, his conversation had nothing whatever to do with the case. The trial judge stated that he believed the witness and denied defendants' motion.

The defendants take strong exception to the conference being held in chambers between the court and the witness in the absence of their attorneys. While we think that it would have been much better if counsel for all the parties had been in attendance when the court talked to the discharged juryman, we can see no wrong having been done to defendants. The trial justice afforded defense counsel an unlimited opportunity to examine the former juror when he assumed the witness stand. He did answer certain inquiries made of him by counsel. Though we may not commend the type of conference disclosed here, we find nothing whatever which shows that defendants' rights were prejudiced in any manner. The handling of the extraordinary events which may occur in the course of a trial is a matter left to the sound discretion of the trial judge and the manner in which he resolves such matters will not be disturbed

unless we find a patent abuse of his discretion. There is no such an abuse present in these appeals.

## IV
### The Bureau's Objection
### to the
### Inadmissibility of the Bureau's Records

During the trial, plaintiff said that he never returned to Lincoln Downs after his expulsion by Detective Tempest. In his direct examination, Wickman contradicted this testimony by telling the court and jury that he saw plaintiff at the track about a year later. The bureau then attempted to introduce into evidence four reports allegedly kept by it in the course of business which show that plaintiff attempted to gain admittance to the track at least four times in 1963. Wickman stated that the proffered reports were copies and the originals thereof were on file in the bureau's headquarters in New York. He conceded that the copies in court have no signature even though there is a signature line at the bottom of the reports. The bureau sought to introduce these reports as further impeachment of Webbier's statement that he had never come back to the track.

While we have real doubts as to the materiality of impeaching a plaintiff on a collateral issue, though we feel that the missing signatures cast a substantial shadow on the authenticity of the so-called business records, we uphold the court's refusal to allow these documents into evidence for a more basic reason. G. L. 1956, §9-19-13 concerns the admissibility of records made during the course of business and represents our state's efforts to modernize the common-law rule concerning the admission of such evidence. While the statute has been liberally construed as to the type of documents which are embraced by its provisions, there are certain prerequisites which must be satisfied before a record shall be admissible.

For a business record to be admissible under our statute, it is required that (1) the record be made in the regular course of business; (2) it must be the regular course of business to make such a record; and (3) it must be made at or near the time of the act, transaction or event. Here, while Wickman stated the reports were kept in the usual course of the bureau's business, there was no evidence adduced as to when the proffered records were executed. This failure in and of itself required that the records be barred from the jury's view.

## V
### Was the Bureau's Action Privileged?

As noted before, the general assembly has authorized any licensed racetrack in this state to refuse admission to or to eject from its premises any persons who it believes is undesirable and whose presence is inconsistent with the proper conduct of a racing meet. The bureau claims that this provision immunizes it from any liability because of the action of its agent-in-charge and the two detectives. We do not subscribe to this theory.

In our opinion the statute is clear and unambiguous. It gives a duly licensed racetrack the right under certain circumstances to refuse admission to its premises and to eject therefrom various individuals. The legislature did not, however, grant the track any right to detain these people. Instead it vested in the track the sole discretion to determine if it would bar a person seeking admittance to the racetrack enclosure or to remove him if he had gained entrance. The legislature has stated that the track may eject any person who, in its *"sole judgment"* is *"* * * undesirable, and whose presence is inconsistent with the orderly and proper conduct of such race meeting."* The use of the term "sole judgment" precludes us from reading into the act a further legislative grant whereby the track could detain a person while it investigates his activities. Any at-

tempt by this court to read into this statute an additional right by the track to detain a suspected patron in the light of the language used by the general assembly would smack of judicial legislation. If §41-3-17, as amended, is to authorize the detention of a racing patron, such a right must spring from some future legislative action and not this court.

The ejection statute affords no protective shield for defendants' liability for the false imprisonment of Webbier.

## VI

### Motions for a New Trial

In considering the respective motions for a new trial, the trial justice made an extensive review and analysis of the evidence which related to the incidents which took place in the bureau's office on that September afternoon in 1962. The court categorically stated that he believed plaintiff. He characterized the testimony of the bureau's agent-in-charge as being evasive. The trial judge specifically rejected the detectives' tale that nobody touched plaintiff. He commented favorably on the testimony of the psychiatrist who declared that the episode of September 6, 1962 aggravated and rekindled Webbier's emotional difficulties.

As noted before, the trial of these two cases was held after the effective date of the new superior court rules. While the track now questions the propriety of some evidence that was produced relative to certain elements of damages because it varied from the allegations in plaintiff's declaration, we pointed out in *Cofone* v. *Narragansett Racing Ass'n,* 103 R. I. 345, 237 A.2d 717, that the common-law restriction that the proof conform to the pleadings no longer holds in this jurisdiction. Here evidence relating to plaintiff's loss of wages and aggravation of his preexisting mental condition was admitted without objection. As we said in *Cofone,* Rule 15(b) provides that issues tried by express or implied consent shall be treated in all respects

as if they have been pleaded. The issues of plaintiff's earning capacity and his preexisting condition were proper matters for the jury's consideration.

The record discloses that Webbier was hospitalized after his visit to the track and it also shows that he was under the care and treatment by the veterans administration for an extended period of time. The plaintiff described to the jury in graphic fashion as to how his illness manifests itself. Since the injury involved in false imprisonment is in part a mental one, he is entitled to be compensated for mental suffering and humiliation he experienced particularly as he was being propelled down the stairs in front of the crowd that had gathered. We therefore do not agree with the track when it alleges that the jury's award was grossly excessive.

The jury's award of $4,000 against each defendant was for compensatory damages only. It expressly denied plaintiff's request that he also be given punitive damages. The verdict was returned on November 7, 1967. The following morning, the local newspaper carried a news article about the trial which pointed out, as the trial judge had stated in his instructions, that plaintiff could recover this amount from only one of defendants. Attached to plaintiff's motion for a new trial is an affidavit by one of his attorneys in which he alleges that conversations with the jurors after the article appeared made it clear that the jury had erred because they thought Webbier would receive a total of $8,000. The jurors had mistakenly allocated the sum between the two defendants. The trial justice in his rescript confirms the fact that the jury foremen called upon him after the article was published and told the court that the jury had intended to award plaintiff $8,000.

The trial justice in granting the additur pointed out that had not Webbier been mistreated at the track, he could have continued to earn the modest sum of about $25 a week

and that he was prevented from performing any gainful occupation for at least two years. He described plaintiff's pain and suffering as being real and substantial. He then concluded that $7,500 would have been a just verdict in these circumstances.

This court in *Fitzgerald* v. *Rendene,* 98 R. I. 239, 201 A.2d 137, declared that there is no precise formula by which an additur may be determined and we are reluctant to interfere with a trial judge's finding on that issue unless it clearly appears that the damages added by him are excessive. The trial justice saw and heard plaintiff describe the mental anguish and anxiety he has suffered since September 1962. We cannot, from the cold record which is before us, state that the superior court was clearly wrong in fixing the amount of the additur or that the amount there was unmeasurable. Nor do we find any grounds to order a new trial on both issues of liability and damages as requested by defendants. There is not the slightest hint in the record that the verdict returned by the jury was a compromise on the issue of defendants' liability. We would also point out that there is nothing in this record which even remotely suggests that the trial court's decision on the respective new trial motions was influenced in any degree either by his post-trial conversation with the jury foreman or the affidavit submitted by plaintiff's counsel.

It is our belief that the trial justice has correctly discharged his duty as he considered the various motions for a new trial. Having weighed the evidence and passed on the credibility of the witnesses, he determined that there was a difference between the jury's award and the damages suffered by the plaintiff and finding that the verdict was inadequate, reversed it so as to compensate the plaintiff fully. We shall not disturb his findings. See *Handy* v. *Geary,* 105 R. I. 419, 252 A.2d 435.

In each case, the defendant's appeal is denied and dis-

622

missed and each case is remitted to the superior court for a new trial on compensatory damages only unless the defendants shall within the period to be fixed by that court consent to the additur heretofore awarded by the trial justice.

*Joseph B. Carty, Herbert Katz,* for plaintiff.

*Jordan, Hanson & Curran, William A. Curran, Joseph M. Hall,* for Thoroughbred Racing Protective Bureau, Inc., *Keenan, Rice & Dolan, John T. Keenan,* for Burrillville Racing Association, for defendants.