[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This case is before the Court for decision following a non-jury trial on a complaint filed by Plaintiff, Rose Enterprises, Inc. The Plaintiff initially filed this action asserting a mechanics lien on certain property located in the Town of New Shoreham. On April 23, 2003, before this action came to trial, Mr. Justice Silverstein of the Providence County Superior Court issued a decision in Sells/Greene BuildingCompany, LLC v. Robert V. Rossi and Linda A. Rossi, P.B. No. 02-1019, andGem Plumbing and Heating Co., Inc. vs. Robert V. Rossi and Linda A.Rossi, P.B. No. 02-2778[1] declaring the Rhode Island Mechanics Lien Statute unconstitutional in whole or in part. Thereafter, the parties agreed to amend the petition to enforce the mechanics lien to include breach of contract, quantum meruit and unjust enrichment, and proceeded only under the claims of breach of contract, quantum meruit and unjust enrichment counts.
The case was tried in proceedings before the Court during March and April 2004.
 Findings of Fact
In June 2000 Robert Rose, the principal of Rose Enterprises, Inc., reached a verbal agreement with Dr. John A. Willis to construct a home on property owned by Dr. Willis on Block Island
Mr. Rose is the principal of Rose Enterprises, Inc., which operates a construction business in the Town of New Shoreham, Rhode Island Mr. Rose is experienced in construction, having commenced work in a variety of commercial and residential construction projects in 1967, while having performed almost all of his work on Block Island Mr. Rose worked on a broad variety of projects. His work has included everything from small household repairs, to additions, to construction of houses and barns, to additions to major commercial facilities on the island
Dr. John A. Willis is a retired family physician who lives on the island He has had a home on Block Island for approximately 25 years and purchased the property which is the subject of this dispute approximately 18 years ago. Mr. Rose and Mr. Willis had an extremely friendly relationship until the construction of the subject house. Prior to this project, Rose Enterprises performed a number of construction projects for Dr. Willis. Rose Enterprises' projects included laying the foundation for a barn, construction of a barn, and construction of an addition to a house. Each of these construction projects was billed on a time and materials basis meaning that Mr. Rose and his other employees were paid for their time plus the reimbursement of the cost of the materials used.[2]
The addition to the house was particularly noteworthy because it was no small project. It was a 30 by 30 foot addition, including a foundation, a crawl space, and two stories. There was no agreement in writing, but the parties had discussed the price of $70,000 at the commencement. At the end of the construction, Dr. Willis had agreed to pay $75,000 even though he had to hire a mason to complete the chimney and another sub-contractor to complete the floor. During this construction project, Dr. Willis complained about the time that it took for Rose Enterprises to complete its work.
Eventually, Dr. Willis showed sketches and promotional materials which he had received to Mr. Rose. The promotional materials were for a log cabin "kit" which Dr. Willis was considering purchasing, but never purchased. Mr. Rose clearly disfavored the construction of a log cabin and the use of a kit and offered to perform the construction project for Dr. Willis.
Although the parties reached a consensus that Rose Enterprises would construct a house for Dr. Willis, the other terms remained unclear. The parties never wrote out the terms such as the range of construction, the price, or the deadline. During a discussion prior to any construction, Mr. Rose asserts that the parties discussed what would be constructed. Mr. Rose had prepared preliminary draft sketches of a modified log cabin design. He then drew up engineering plans to finalize the specifications.
In September 2000 Mr. Rose obtained a foundation permit. At approximately that time, site work was performed, including flattening a knoll, constructing a retaining wall, preparing a driveway and trenching the septic system. Dr. Willis separately hired a septic system installer. A building permit was obtained in December 2000. At this time, Rose Enterprises and its employees commenced framing the deck, cutting rafters, preparing the post and beam construction and constructing the dwelling itself. This included hand nailing and special notching of the beams.
Several delays occurred during the construction process. One of the delays was in obtaining plans from an engineering firm located on the mainland From October to November 2000 Mr. Rose's health declined and it was necessary for him to receive 45 separate radiation treatments on the mainland
Even so, these delays were not overly unusual as construction of a house on Block Island can often take a full year. Mr. Rose had three or four separate employees working on the project, assisting with the construction. Block Island is a tourist site in the summer and has a limited winter population. Therefore, skilled construction labor must be compensated adequately in order to retain them. It is important for the employer to keep the laborers occupied and paid so that he does not lose the employees.
Mr. Rose incurred bills of $186,357.67 for materials ordered for this project. This includes Arnold Lumber invoices of $77,635.00, and machine time (equipment rentals and the like) of $18,572.50. Other significant bills were for local hardware, specially cut cedar, sheet metal and the like. These are identified in a number of Plaintiff's full exhibits, and summarized in exhibit 36, including plastering, plumbing and siding. Exhibit 29 shows Mr. Rose's tally of time which the employees spent on this project. Instead of charging a premium for all of the labor time, he gave a breakdown of his cost to pay each of the individual employees, including their wages, their payroll taxes, and their other benefits, for a total of 4280.5 hours. This resulted in a net cost of $191,555.81. However, of this time, 1162 hours were for Mr. Rose who was not compensating himself. Mr. Rose's compensation was more similar to a draw from his business, rather than an hourly fee. Mr. Rose also admits that during this time period he was out of work at times, supervising other projects.
Dr. Willis resided on the island and indicated that he was at the site almost every day. He sharply disputes the reasonable labor costs for Block Island To make matters even more confusing, Dr. Willis had hired a number of the sub-contractors directly including the septic system designer. As the dispute arose over money, he offered to pay Mr. Rose's costs directly, including the electrician, and the floor and tile man.
At trial, Dr. Willis was extremely critical of the progress which he referenced as "stalled from the time it started." He was critical of the limited amount of time spent at the site by workers in January and February. However, he did not begin to complain about the delay in construction until March of 2001 at the earliest. From August through May, Dr. Willis was making substantial periodic monthly payments to Mr. Rose, (Ex. G), from $20,000 to $50,000, totaling payments through May 16 of $203,000.
Prior to the completion of the project, Mr. Rose asked Dr. Willis if he would be paid in full for the completed work. Dr. Willis indicated that he would, but no figures were discussed at that time. Dr. Willis did not appear to complain of construction deficiencies while at the site, or refuse possession because of any deficiencies. A certificate of occupancy was issued at Dr. Willis' request in August 2001 although Dr. Willis had already moved into the dwelling in July 2001.
Mr. Beau Brown, a South Kingstown building official, indicated that the Rhode Island Building Code requires a two inch clearance between a fireplace and combustible material unless the fireplace is lined. Rhode Island Building Code 1001.4.
Mr. Richard Tanner, a carpenter and builder for approximately 30 years, was extremely familiar with the business and highly qualified for his knowledge of construction on the mainland He disputed the prices paid for labor on Block Island, but stated that he did little if any work on Block Island, and does not regularly hire Block Island labor. He therefore, disputed the cost for construction time of the dwelling. He asserted that materials should only cost $40,000 to $50,000, but also indicated he would add 25% to costs of any materials, apparently for his own profit. He admitted that costs were higher on Block Island, but did not know how much higher nor did he check on the rates which were paid to other laborers on the island Mr. Tanner was highly qualified as he has constructed hundreds of homes, including 20 custom homes, 2 log homes, and post and beam barns. He was steadfast in his assertion that no premium should be paid for Block Island labor as a "home is a house whether it's here or there". Mr. Tanner also confirmed that the chimney needs a two inch clearance and concurred with Mr. Brown that there should be no weight bearing on the chimney unless an engineer so approves.
 Analysis and Conclusions of Law
The Court finds that Rose Enterprises, Inc. offered to construct a house for Dr. Willis in return for payment. The offer was accepted by Dr. Willis. Consideration was given by each of the parties, and the parties mutually assented to the limited contract terms. Accordingly, a contract existed between the parties.
Each of these gentlemen recognized the importance of a written contract. Dr. Willis and Mr. Rose are both intelligent enough and experienced enough in business matters to realize the value of a written contract laying out all the terms (the deadline for construction, the cost of construction, the method of computing the costs of construction, and the quality of the construction). Each of them should have recognized that without putting their agreement into writing they were risking not only their finances, but their friendship.
Dr. Willis enlisted Rose Enterprises, Inc. to construct a home on his property. He did so without a cap on the cost and apparently without even determining the method of how the price was to be computed, even though he continued to make periodic payments. Although Dr. Willis points to an open "kit" house, he did not buy the kit, or employ Rose Enterprises to build the kit. Instead he knew that Rose Enterprises would be starting from scratch with a unique design. As a result, Dr. Willis cannot point to the price of the kit to infer that it has any value on establishing or limiting the price here.
In the same, Mr. Rose is not without fault. He delayed in presenting Dr. Willis with the bill. Either Mr. Rose was too ill to compute the tally promptly, too busy, or too concerned about his friendship with Dr. Willis to face the bottom line: Rose Enterprises had run into a significant shortfall on the job that would have to be made whole.
From the outset, Dr. Willis' role was confusing. He asserted that "I oversaw," that "I kept myself busy" at the site, and that "I made it my job to watch the situation." However, Rose Enterprises, Inc. was hired as an independent contractor to construct the dwelling. As such, our Supreme Court has clearly stated an independent contractor is retained to perform a task independent of and not subject to the control of the employer.Webbier v. Thoroughbred Protective Bureau, Inc., 105 R.I. 605,254 A.2d 285 (1969), McAlice v. Safeco Life Insurance Company,741 A.2d 264 (1999).
Dr. Willis' testimony is likewise confusing when he attempts to analyze his method of payment. He paid Mr. Rose a lump sum of money when Mr. Rose asked, but did so without ever asking the projected cost or establishing a cap. Even when Dr. Willis claimed he was concerned about the delay, he waited several months before bringing this to the attention of Mr. Rose (who lives on Block Island), or placing anything in writing. Just as odd, Dr. Willis paid subcontractors of Mr. Rose even though the contract was allegedly in dispute.
In his testimony, Dr. Willis apparently attempts to deduct what he paid for from the time and materials expense computed by Mr. Rose. He complains that some of the materials that Mr. Rose received were from another job, excavating at another site. He complains that the workers were without supplies so he retrieved material from a hardware store. He now questions the lack of formal plans, and even computes his own work hours on the site. He pays for sub-contractor's labor which "Bobby" [Rose] suggests he pay, and persists in confusing his role.
Dr. Willis has employed others to perform construction work for him. An intelligent and sophisticated individual, he was a physician in an independent general practice. Clearly he knows what the role of a homeowner should be, employing an independent contractor to construct a dwelling, and if he had problems he was well aware of the need to place his concerns in writing to the contractor immediately. Instead, he did quite the opposite, continuing to pay and then complaining when the final bill came in. This Court is left to question the consistency of his testimony where he uses a variety of different words to describe his conversations with Mr. Rose, never specifically indicating the time, the place or any witnesses or any particular language used during those conversations. Even when the Court inquired, he was vague and ranged various conversations over a period of months. Dr. Willis even paid the sub-contractors after the dispute of Mr. Rose's bill, not because he was in fear of any lien being placed on his property.
The Court finds that Dr. Willis never complained of the speed of the construction until late spring of 2001. Dr. Willis never threatened to terminate Rose Enterprises, Inc. or to enlist the services of another builder. He never requested an accounting until June 24, 2001. Even then he became suspect only in August of 2001 after Mr. Rose deducted $60,000 from the bill.[3]
While the two men were drinking together at Dr. Willis' house in June 2001, obviously they were still not presenting each other with significant questions which should have been in the forefront of their minds. Instead no firm cap or maximum price was ever consented to. As a result of their discussions, the prior relationship of the gentlemen and their conduct, the Court concludes that Dr. Willis employed Rose Enterprises, Inc. to construct this dwelling on the basis of the time and materials contract. This would mean that Rose Enterprises would be paid for the time which has been put into the project, the materials which it purchased and a profit. Dr. Willis recognized that Rose Enterprises, Inc. was intending to make a profit on this construction. This conclusion is also consistent with the practices of the gentlemen during the term of this relationship. No firm price was ever agreed to, but it was clear that Mr. Rose would not construct this dwelling for less than $250,000. Dr. Willis was on site watching the project and even paid for some of the sub-contractors directly, again consistent with the fact that he was monitoring the employees' time and offering to pay the sub-contractors so as to reduce his ultimate bill.
Even in April, May and June, no firm deadline had been established to finish the project, though Dr. Willis claimed, without corroboration, that the completion had become urgent. In January, Dr. Willis recognized that he was behind in his payments to Rose (that is, that Rose Enterprises, Inc., had invested more into the project than Dr. Willis had paid Rose). Dr. Willis claims that Mr. Rose said that he was "right on track" with the progress and the price, but there was never a firm price established. Dr. Willis also claims that he kept working on the site to assist in keeping the price down. This would be irrational if a fixed price had already been established.
Dr. Willis, alleging that the contract was in breach, bore the burden of proof to establish that Rose Enterprises, Inc. breached the contract.Gorman v. St. Raphael Academy, 853 A.2d 28, 37 (R.I. 2004).[4] Dr. Willis was contradictory in testifying that he had accepted the house but not the quality, and then testifying that he never accepted the house or the quality. He insisted he never gave a list of the problems to Mr. Rose because he never had to. Dr. Willis showed a great deal of concern for items which would have no bearing on a fixed price contract or a time and materials contract. For example, Dr. Willis focused on the fact that some raw materials were used from another work site that Mr. Rose had been at; and that at one point Mr. Rose was ahead of Dr. Willis by approximately $30,000. At another point, Mr. Rose had not yet paid all of his sub-contractors. Clearly, Dr. Willis erred in his role in this independent contract.
Dr. Willis was concerned that Mr. Rose did not log all of his time and that Mr. Rose's hourly rate was not always a consistent rate. Dr. Willis was concerned that Mr. Rose was working on other jobs at the same time. He noted that Mr. Rose billed his labor at $35 per hour, but that Rose Enterprises' labor was billed at a higher rate, even though Dr. Willis' expert, Mr. Tanner, indicated that he would do the same, and Dr. Willis acknowledged that Mr. Rose was entitled to a profit. Dr. Willis even criticizes the amount of benefits which Mr. Rose receives from Rose Enterprises, Inc. Although Dr. Willis obtained the services of an expert, this combined effort was unable to overcome the Plaintiff's proof that skilled labor on Block Island receives at least $35 per hour.
As a result, the Court is left to construe a time and materials contract without a set price, without a set deadline, without a description of the contract's scope, and without a writing.
 Computation of Damages
Based on the evidence presented, the Court makes the following computation of damages. The Court finds that Messrs. Lischke, Brown, Ernst and Rose were skilled laborers and the rate for their work on Block Island would be $35 per hour. The Court finds that Messrs. Paine, Reynolds and Kildae[5] were unskilled, and their work should be billed at the rate of $20 per hour. Messrs. Paine, Reynolds and Kildae worked a total of 369 hours resulting in $7,380. Messrs. Lischke, Rose and Ernst charged a total of 3911.5 hours to this project. The Court deducted a total of 300 hours from the work that these gentlemen performed during January and February 2001 given that it appears that little work was done during this time period. The Court therefore finds that 3611.5 hours of skilled labor was devoted to this project. Multiplying this by $35 per hour this would total $126,402.40 for skilled labor. Plaintiff therefore incurred costs for labor of $133,782.50.
The Court finds Plaintiff incurred expenses for materials and subcontractors of $186,357.67 (see Ex. 36). The parties all agree that Rose Enterprises, Inc. is entitled to a profit over and above these amounts. Mr. Tanner, Defendant's expert, conservatively placed that profit in a range of 10 to 15%. Because Mr. Rose accepted a substantial risk by not placing this agreement in writing, and never confirmed the amount of the profit or the cost of construction, the Court will award him a profit of 10% or $32,014 resulting in a subtotal of $352,154.17. To this, Dr. Willis has already made payments of $230,000. The resultant total is $122,154.17.
However, the Court finds that there were defects remaining in the workmanship after the parties parted. A tub-shower unit was installed even though it had a defect. The Court finds that it would cost $500 to repair this defect and will reduce this amount from the total damages to be awarded. The Court also finds that excess materials were ordered for the project including large beams left at the premises. The Court therefore deducts the sum of $10,000 for excess materials which were over ordered on this project, and included in the materials tally. The Court further finds that the beam should not rest upon the chimney masonry and accepts Mr. Tanner's estimate that it would cost $11,000 to repair this defect. The Court also finds that the lolly column was not placed in a concrete block according to plan and finds that the cost of repairing this would be $7,000. Credit is also given to Dr. Willis for $5000 which he paid to Mr. Briggs, an electrician, for work subcontracted by Mr. Rose. After these deductions, the Court, therefore, awards compensatory damages to Rose Enterprises, Inc. in the amount of $88,654.17.
Judgment shall enter for the Plaintiff for $88,654.17, plus interest and costs to be calculated by the clerk. Counsel for the Plaintiff may present an appropriate order and judgment.
[1] These two cases were consolidated.
[2] Some contractors charge a premium on top of the materials in order to obtain a profit.
[3] He testified [April 5] "we were having problems supervising employees."
[4] Both parties claimed a breach of the contract. Rose Enterprises, Inc., claimed that Dr. Willis breached by failing to pay the amount due under the contract, and there was no dispute about how much had already been paid. As Dr. Willis was claiming that the work performed was somehow deficient, he bore a significant burden.
[5] The seven gentlemen were laborers of Rose Enterprises, Inc.