DECISION
This matter was tried by the Court sitting without a jury on September 13 and 14, 2006. Count I of the Amended Complaint, filed in 2002, alleges that the Plaintiff, Bridget Generis (hereafter "Plaintiff" or "Mrs. Generis") has certain rights to the use of her driveway and adjoining vegetation, and is entitled to injunctive relief relative to the use of said driveway that crosses Wildflower Road, a private street in Charlestown, Rhode Island, owned by the Defendant, Foster Cove Improvement Association (hereafter "Defendant" or "FCIA"). By way of a prayer for permanent injunction, Plaintiff seeks to enjoin Defendant from interfering with the property rights which she claims. Count II seeks injunctive relief relative to the use of that portion of Wildflower Road which adjoins her property and serves as access to the water, a parcel to which Plaintiff claims rights superior to the Defendant. That count as well seeks to enjoin Defendant from interfering with the rights Plaintiff claims. The following constitutes the Court's findings of fact and conclusions of law as required by R.I. R. Civ. P. 52(a).
 FINDINGS OF FACT
1. Mrs. Generis is the owner of a home at 149 Wildflower Road, Charlestown, Rhode Island. The home was previously owned by Mrs. Generis and her late husband, James Generis, who purchased the home in 1992. The immediate predecessor in title to the Plaintiff was Harriet Bower who purchased the property from Edward C. Duhamel in 1972. Subsequent to the conveyance to Mrs. Bower, Mr. Duhamel developed the Foster Cove residential subdivision and dedicated the properties now owned by FCIA to use as roadways within the subdivision. The original Foster Cove Plat map was recorded in April, 1973. The corrected Foster Cove Plat was recorded in September, 1978.
2. Mrs. Generis' home is part of a platted subdivision known as Foster Cove. The roads in the Foster Cove subdivision are owned by Defendant FCIA, a not-for-profit corporation that is an association of the members of Foster Cove. FCIA is a private property association that was formed and incorporated in the early to mid-1980s.
3. Although Wildflower Road is 40 feet wide, only 10 to 18 feet of the roadway is paved (14 foot average). At all times, Mrs. Generis' driveway has been approximately 15-16 feet wide where it meets her property line. The driveway broadens as it crosses the FCIA property toward Wildflower Road, and in 1992 the apron was approximately 35 feet wide where it intersects Wildflower Road. When the pavers were installed, the driveway apron was narrowed to some extent and it is now approximately 25 feet wide at the intersection with Wildflower Road. Both sides of the driveway apron flare out at the roadway intersection, a decorative feature of the driveway apron. Installation of the pavers does not interfere with the use of Wildflower Road by Foster Cove homeowners.
4. In order for homeowners such as Mrs. Generis and other Foster Cove homeowners to reach their driveways from the paved portion of Wildflower Road and other private roads in the Foster Cove subdivision, the homeowners must drive across the unpaved portion of the FCIA-owned roadway. If Mrs. Generis and other Foster Cove homeowners could not cross FCIA-owned property, they could not reach their driveways.
5. Foster Cove homeowners have been permitted by FCIA to extend their driveways over the FCIA property they drive across.
6. An extension of Wildflower Road (the "Wildflower Road Extension") runs along the western side of Mrs. Generis' property toward Ninigret Pond. Foster Cove homeowners, including Mrs. Generis, have a right of access to the Wildflower Road Extension, including the driveway apron that links Mrs. Generis' driveway to Wildflower Road.
7. Existing at the time of the construction of the Generis home and to the present day, just to the north of the driveway, there is a drainage ditch and a utility pole which is supported by a guy wire that extends from the pole to the ground. These conditions have continuously existed to the present day. These conditions preclude the plaintiff from moving the driveway north.
8. In the 1970s and 1980s, vehicles were not permitted on the right-of-way known as the Wildflower Road Extension, nor was parking allowed.
9. Throughout the 1970s and 1980s, the path on the right-of-way was less than 10 feet in width and was located in the middle of the right-of-way.
10. In November 2001, the FCIA sought and received approval from the Coastal Resources Management Council (CRMC) to clear the right-of-way to a width of 25 feet. In the spring of 2002, the FCIA caused a 25-foot wide path to be cleared on the right-of-way, beginning from the Generis property line. Most of the native vegetation that existed along the Generis property line was removed in 2002. A kayak rack and bicycle rack were installed, along with wooden pylons to block vehicles from going within 50 feet of the water.
11. In 1993, the FCIA applied to CRMC for permission to install a dock at the end of the Wildflower Road Extension. That permission was granted, and a dock was constructed at the terminus of the Wildflower Road Extension.
12. Parking has never been allowed on the Wildflower Road Extension. The parking ban was formalized in "dock rules" at the time the dock was going to be installed. The dock rules have been modified from time to time, but parking has always been prohibited. Since the construction of the dock, vehicle access has been permitted on the Wildflower Road Extension for loading/unloading people and possessions. The CRMC was aware that vehicular traffic was permitted for drop off/pick up purposes, but no parking was permitted on the Wildflower Road Extension. The dock rules advise FCIA members not to interfere with Mrs. Generis' access to her driveway.
13. After the dock was constructed, presumably due to the increased use of the Wildflower Road Extension to gain access to the dock, and despite the dock rules to the contrary, there have been several occasions when vehicles have been parked at or near the entrance to the Wildflower Road Extension in a manner that blocked or impeded Mrs. Generis' vehicular access to her property.
14. In response to the Generis' complaints regarding blocked access, the FCIA board permitted the Generises to install two planting berms, one on either side of the driveway. The berms contained boulders, which had been used previously by Kenneth Duhamel to block vehicular access to the right-of-way.
15. The berm on the north side of the driveway extended from the FCIA — Generis property line to the edge of the pavement on Wildflower Road. The berms were comprised of mulch, loam, rose bushes and boulders, and were 12 to 18 inches above grade and 5 to 7 feet wide.
16. The berms on either side of the Generis driveway were not necessary to afford Plaintiff access to her lot across Wildflower Road. They serve, at most, to dissuade persons using the right-of-way to the north of the Generis property from parking cars or impeding access to the Generis driveway. Similarly, although the berms were built across land owned by the FCIA, they did not pose an impediment to vehicular or pedestrian access to the Wildflower Road Extension by members of the FCIA wishing to access the right-of-way or the FCIA dock located at its terminus.
17. Certain members of the FCIA objected to the vegetative berms installed by Mr. and Mrs. Generis. Although the suggestion was that the berms interfered with the members' use of the Wildflower Road Extension, at most the berms resulted in users of the right-of-way having to go around the berms to access the right-of-way, rather than actually crossing the Generis driveway apron that was built across the FCIA property.
18. In June 2001, while Mr. and Mrs. Generis were in Connecticut, a company hired by the FCIA removed the pavers that the Generis' installed on that portion of the driveway which crossed the unpaved portion of the FCIA road. In addition, the berms originally constructed with permission of the FCIA were removed. All of this occurred at a time when Mr. Generis was terminally ill, causing increased emotional strain on Mrs. Generis. Mr. Generis died in August, 2001. With the aid of an order from this Court, Mrs. Generis reinstalled the pavers that had been removed. The vegetation berms have not been reconstructed.
 ANALYSIS
Plaintiff alleges that she has acquired an easement of necessity with regard to that portion of her existing driveway which crosses the unpaved portion of Wildflower Road, a private road owned by the Defendant Association. The portion of the driveway alleged to constitute the easement has been improved with the use of interlocking paver bricks, and generally follows the direction that pre-existed when the predecessor in title to the Generis' joined the gravel driveway to the oiled roadway owned by the FCIA. The current driveway has been narrowed to approximately twenty-five feet in width at the point of intersection with the asphalt portion of Wildflower Road.
Whether an easement exists by necessity is a question of fact.Nunes v. Meadowbrook Development Co., Inc., 824 A.2d 421, 425 (R.I. 2003). In Nunes, the Supreme Court articulated the following test for creating such a right: "The test of necessity is whether the easement is reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made." Id. at 425 (quotingWiesel v. Smira, 49 R.I. 246, 250, 142 A. 148, 150 (1928). In addition, the court must consider whether "a substitute could be procured without unreasonable trouble expense." Id. Access rights will be implied relative to a conveyance of land that was in common ownership if the result of the failure to infer such a right of access would be to render the parcel inaccessible. See Thompson v. Whinnery, 895 P.2d 537, 540
(Colo. 1995). See generally Restatement (Third) of Property § 2.15 (2000). The most commonly implied access rights are those to connect property with a public road. Id. at § 2.15 cmt. b. In addition, rights are implied incident to an easement by necessity to permit the user of the easement (the dominant estate) to do what is reasonably necessary for the enjoyment of the property if the conveyance would otherwise eliminate the property owner's right to do such things. Id.
Under the above stated standard, the Plaintiff has established an implied easement to cross the unpaved portion of Wildflower Road, owned by FCIA, to secure access to her property by vehicles. The Generis and FCIA properties were previously in common ownership. The driveway access to Wildflower Road pre-existed the Plaintiff's installation of paving bricks and is located in approximately the same area as the previous unpaved driveway. The driveway could not be located in a different area without vehicles crossing FCIA property to gain access to the Generis lot. In addition, the right of Mrs. Generis to cross FCIA property to access the paved portion of Wildflower Road is consistent with the existing uses of other property owners in this development. Finally, counsel for the Defendant conceded at trial that his client agrees to the declaration of an easement of necessity, at least insofar as such an easement is co-extensive with the width of the existing driveway as it crosses the FCIA property and joins with the paved portion of Wildflower Road.
In her post-trial memorandum, counsel aptly summarizes the issue before the Court which has been the focus of this litigation: whether the plaintiff may reinstall the planting berms that were permitted by FCIA and formerly were in place along either side of her driveway. The question as posed resolves the issue of adverse possession.See Amended Complaint, ¶ 16, 17. Because the use of a portion of the FCIA property for construction of the berms was done with permission of the owner, the element of hostility, an essential element of a claim of adverse possession or prescriptive easement, does not exist.See Stone v. Green Hill Civic Assn., 786 A.2d 387, 390-91 (2001). Rather, the Plaintiff suggests that the berms are necessary for the Plaintiff's reasonable use and enjoyment of the easement of necessity, i.e. the driveway. See Sharp v. Silva Realty Corp., 86 R.I. 276, 285,134 A.2d 131, 136 (1957); First Baptist Society v. Wetherell,34 R.I. 155, 158, 82 A. 1061, 1062 (1912).
The facts, however, do not support such an extension of the easement of necessity in this case. There is certainly nothing in the configuration of the land that would require Mrs. Generis to use FCIA property to build essentially vegetative "blockades" for her to realize reasonable access to her property. The only testimony relative to the additional "necessity" is that within the last six years there have been four instances when vehicles were parked on the FCIA property in such a manner as to impede access to the Plaintiff's driveway. There is no evidence that it was the Defendant or members of the Defendant Association that, in violation of Association rules, parked vehicles within the right-of-way. Furthermore, in cases involving the creation of an easement of necessity, the condition creating the "necessity" is some configuration of the real property which impedes the owner of the dominant estate from access, or otherwise conflicts with the dominant estate's useful enjoyment of the easement. In other words, it is a "conveyance" that results in the deprivation of access which gives rise to the implication of an easement of necessity. See generally
Restatement (Third) of Property § 2.15.
With regard to the alleged need of Mrs. Generis to increase the width of the easement to accommodate the berms, the "necessity" alleged is the fact that on some infrequent occasions, persons who may or may not be associated with FCIA, the owner of the servient estate, have parked vehicles in such a way as to impede access to her property. Such human behavior, as opposed to the conveyance of the land itself, is insufficient to give rise to the expanded "easement of necessity" alleged by the Plaintiff. Even if, as Plaintiff has suggested, the berms do not necessarily prevent access to the water by means of the Wildflower Road Extension,[1] it is Plaintiff's burden to prove that she is legally entitled to make use of the FCIA property for such expanded use, and that such expanded use is made necessary by reason of the conveyance of the land to ensure her unfettered vehicular access to her lot. The Court does not believe that Mr. Generis has met her burden in this regard.[2] Accordingly, the Court will not order that the Defendant be required to allow the Plaintiff to reinstall the berms as previously permitted.
Although the Defendant is entitled to use that portion of its property that also serves as driveway access to the Generis lot, the Defendant may not use such property over which the easement lies in a manner that impedes use of the easement by the Plaintiff. Accordingly, this Court will permanently enjoin the Defendant, and all persons acting in concert with the Defendant, from parking vehicles on the Generis property or on any portion of the FCIA property, including the Wildflower Road Extension, so-called, that in any way blocks or impedes reasonable access to the Generis property through the use of the driveway in accordance with its present configuration; provided, however, that vehicles may "live" park temporarily on or near the Wildflower Road Extension to load or unload passengers or gear.
Finally, a question has been raised by way of a post-trial motion to amend the complaint to conform to the evidence presented at trial. In particular, the Plaintiff's motion asks the Court to consider a prayer for damages associated with the Defendant's alleged unlawful removal of the driveway pavers and the landscape berms, and the costs incident to reinstallation of the driveway. The allegations relative to such damages were included in the Amended Complaint. See Amended Complaint, ¶ 22-25. However, the pleading lacks a specific prayer for damages.[3] At trial, evidence was introduced without objection relative to the cost of the replacement of the paver bricks. See Exhibit 26. In addition, testimony was elicited from the Plaintiff relative to the same. It is well settled in this jurisdiction that where evidence which varies from the allegations of the complaint is admitted without objection, the case will be treated as if the issues had been pleaded. See Duquette v.Godbout, 416 A.2d 669, 672 (R.I. 1980); Webbier v. Thoroughbred RacingProtection Bureau, Inc., 105 R.I. 605, 619-20, 254 A.2d 285, 293 (1969). Evidence that the Plaintiff expended $6,344.17 for the material and labor necessary for the reinstallation of the pavers was introduced without objection by the Defendant. That, together with the allegations in the Amended Complaint, served as fair notice that such amounts were being sought as part of this case. Because the pavers as originally installed were necessary to secure the easement, and since there was evidence that the pavers were wrongfully removed by the Defendant or at its request, this Court will deem the prayer amended to include a claim for the costs necessary to repair the damage, and judgment may be entered against the Defendant in the amount of $6,344.17, together with pre-judgment interest at the statutory rate from July 31, 2001.[4]
 CONCLUSION
Judgment shall enter for the Plaintiff in accordance with the terms of this decision. Counsel for the Plaintiff shall prepare and submit a form of judgment.
[1] Vehicles attempting to enter the Wildflower Road Extension to gain access to the dock, rather than crossing that portion of the FCIA property blocked by the berms, would have to make a sharper right angle entry to the right-of-way in order to avoid the berms as they were previously constructed.
[2] Typically, a plaintiff must demonstrate that an easement of necessity is created by "clear and convincing" evidence. Myers v.Strickley, 375 S.E.2d 595, 598 (W.Va. 1988).
[3] The original Complaint, filed July 17, 2001, did contain a prayer for damages.
[4] The Plaintiff's post-trial memorandum also requests an additional sum of $14,700 for the anticipated future cost of restoring cable and telephone service damaged by the Defendants, and attaches an invoice in that amount from Jeff Nadeau Construction dated November 7, 2006. This invoice post-dates the trial of this matter, and no such evidence was introduced at trial. Accordingly, the judgment will not reflect this post-trial addition.